No. 46,759

CLARICE BYERS, *Appellee,* v. HESSTON APPLIANCE, INC., *Appellant.*

(509-1151)

Opinion filed May 12, 1973.

*Darrell D. Kellogg,* of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause, and was on the brief for the appellant.

*Evart Mills,* of Mills & Mills, of McPherson, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

FONTRON, J.: This is an action to recover damages for the death of Tilford L. Byers. The action is brought by his widow, Clarice Byers, to whom we will refer as plaintiff, pursuant to the provisions of K. S. A. 60-1902. The case was tried to a jury which found in favor of the plaintiff and judgment was entered on the verdict. The defendant, Hesston Appliance, Inc., herein sometimes called Hesston, brings this appeal.

Mr. Byers was electrocuted July 7, 1969, when he took hold of

the "breaker" or switch handle in an electric control box connected with a motor used in pumping an oil well on a lease operated by him in Harvey County. Hesston had recently installed the control box on a service pole without having grounded it. The present action was brought on the theory that Hesston's failure to ground the box constituted both simple negligence and wanton conduct, and such was the posture in which the case was tried.

In response to special questions submitted by the court, the jury returned the following answers:

"1. Was the defendant negligent in any manner which was a cause of the death of Tilford Byers?

"ANSWER: Yes.

"2. If you answer question No. 1 'yes', then state such act or acts of negligence.

"ANSWER: The defendant should have either disconnected the electricity at the service entrance or bonded the box to the ground rod.

"3. Was Tilford Byers contributorily [sic] negligent in any manner which was a cause of his death?

"ANSWER: Yes.

"4. If you answer question No. 3 'yes', then state the act or acts of contributorily [sic] negligence.

"ANSWER: #1. By completing the wireing [sic] in the switch box and energizing the switch box when he knew the work had not been completed by defendants. #2. By improperly maintaining the switch box and weather cover in that it was not enclosed at the time of the accident and prior thereto.

"5. Were there any reckless or wanton acts of the defendant which were a cause of the death of Tilford Byers?

"ANSWER: Yes.

"6. If you answer question No. 5 'yes', then state said act or acts.

"ANSWER: In leaving the McBurney lease with the inlet side of a switch control box energized with 440 volts of electricity without the switch control box being grounded.

"7. If you find for the plaintiff, how much damages do you find she should receive:

"ANSWER: $21,658.51."

In this appeal the issues are framed in somewhat different terminology by each of the parties but we believe that, essentially, the question may be stated as being whether the finding of reckless or wanton conduct is supported by the evidence. We approach our discussion on this basis.

On June 27, 1969, the defendant was employed to install a new electrical service pole on the lease to replace a pole which had been blown down the day before. When the new pole was in place, Hesston's workmen attached the control box thereto, and recon-

nected the box to a high-voltage power line which serviced the lease.

After this connection had been completed and the box had thus become energized, Byers said he wanted to see if the motor would operate, and the workmen accommodated him by connecting the motor, temporarily, and turning on the juice. It was thereupon discovered that the motor had been burned out and would have to be rewound. One of the workmen thereupon removed the fuses from their sockets and laid them in the bottom of the box. After this had been done the workmen left the lease without grounding the box and without telling Mr. Byers that the box was not grounded.

The evidence is conflicting as to what transpired as Hesston's employees were leaving. The Hesston company was not equipped to rewind motors and Roger Smith, its president and one of the electricians present, testified that Byers was to have the motor rewound and that Hesston would come out and complete the job when Byers called. Other testimony tends to conflict with this version. Mrs. Byers testified that her husband, on return home that evening, said nothing to such effect but, on the contrary, said he was not going to call Hesston Appliance again but would find someone else, even if he had to wait on them. Similar testimony was given by a second witness to whom Byers had talked the following day. It is of some significance in this connection that on July 1, six days before the tragedy occurred, Hesston sent Byers a statement in the amount of $145.30.

Byers took his motor to a shop in El Dorado which loaned him a motor for interim use. This motor was brought out to the lease and installed on June 28. At the same time Byers replaced the fuses which were lying in the box with fusetrons which he obtained from the electrician who was installing the motor. He then proceeded to turn on the switch, and the motor was in operation.

On the day of his death Mr. Byers and an acquaintance had gone to the lease to work on an adjacent well. On their way they passed the well in question and saw that it was pumping. While they were still working the two men observed that the subject well was no longer pumping and, accordingly, they stopped there on their way home to investigate. Byers told his friend not to touch anything until he had pulled the breaker and turned "this thing off." He then took hold of the switch handle and started to turn it off but

was instantly stricken with a full electrical charge. His demise was swift.

The phrase "wanton conduct" is no stranger to the law, now is it new to this court. It has appeared before us throughout many years and on many occasions, although not, we may add, under the identical circumstances appearing here. As a legal term it was capably defined in *Frazier v. Cities Service Oil Co.*, 159 Kan. 655, 157 P. 2d 822, as follows:

". . . [W]anton conduct or wantonness comes between negligence on the one hand and willful or malicious misconduct on the other; that it is more than negligence and less than willfulness, and to constitute wantonness the act complained of must show not simply lack of due care, but that the actor must be deemed to have realized the imminence of injury to others from his acts and to have refrained from taking steps to prevent the injury because indifferent to whether it occurred or not. Stated in another way, if the actor has reason to believe his act may injure another, and does it being indifferent to whether or not it injures, he is guilty of wanton conduct." (p. 666.)

This definition has been repeated in essence many times and has been used to delineate the framework within which issues going to wanton or reckless conduct are to be determined. *Blackburn v. Colvin*, 191 Kan. 239, 380 P. 2d 432; *Mathes v. Robinson*, 205 Kan. 402, 469 P. 2d 259; *Kohler v. Kansas Power & Light Co.*, 192 Kan. 226, 387 P. 2d 149; *Duckers v. Lynch*, 204 Kan. 649, 465 P. 2d 945; *Anderson, Administrator v. White*, 210 Kan. 18, 499 P. 2d 1056. Our function at this time is to decide whether the defendant's conduct falls within the pattern of wanton or reckless conduct as contemplated by our rule. If the defendant's actions fit the dimensions of the rule, then the plaintiff must prevail, since it is a well-established principle that contributory negligence is no defense to wantonness. (See cases in 4 Hatcher's Kansas Digest [Rev. Ed.] Negligence, § 28.)

We need not delve into the evidence in great depth, but certain observations need to be made. First of all we should point out the following statement made by the defendant in its brief: "There is no question that, upon the completion of the job in this case, prudent practice would have required that the control box be grounded by means of a wire leading from the control box to a rod driven into the ground." This frank concession finds ample support in the record. The defendant continues by saying that disagreement between the experts is over when the ground should be made.

In our opinion there was a profusion of evidence coming from experienced electricians that an electric control box should be

grounded before being energized; that this is a basic concept in oil field work even though the national Electrical Code, which apparently has not been adopted in the oil fields, may not specify at what point in time the ground is to be made; that any electrical control mechanism should be grounded before being energized; that this becomes more important as voltage is stepped up from 110 to 220 or 440 volts; that the grounding system is generally the first thing to be installed; it is a standard accepted safety practice. The defendant, it is true, presented evidence to the effect that it was an accepted practice to energize a control box at the conclusion of a job. However, the jury, as the finder of the facts, was not obliged to accept this testimony as true. It was for the jury to weigh and evaluate the evidence and to resolve the conflict. In this connection Roger Smith himself testified that anything over 100 volts is dangerous; that 440 volts is highly unpredictable; and that he agreed a very high degree of care should be exercised in its handling. Jimmy Dean, one of Hesston's workmen, testified he was fully aware of the dangers of electricity but did not hook up the grounding wire; that a ground wire would have to be put in to complete the job and he thought they were coming back next day to complete it. Instead, the evidence shows, Hesston never did return, never did call Byers about coming back, and did nothing more than send a bill for its work.

By any standard, electricity has been a tremendous boon to mankind generally. Modern man, snug in his civilized society, has become fearfully dependent on its beneficence, as any stout fellow will loudly proclaim once his current has been cut off. However, this fundamental entity or phenomenon of nature is fraught with a vast potential of hazard to the careless and the unwary. So lethal is its charge and so well known its capacity for inflicting death or injury that judicial note may well be taken of its dangerous propensities. This court has frequently spoken of the high degree of care required of those who generate and supply electric power. (*Followill v. Gas & Electric Co.*, 113 Kan. 290, 214 Pac. 430; *Railway Co. v. Gilbert*, 70 Kan. 261, 78 Pac. 807; *Cope v. Kansas Power & Light Co.*, 192 Kan. 755, 391 P. 2d 107.) Those who are wont to deal with such a dangerous agency for their own advantage, either in the installation or repair of facilities which transmit or employ electric power, may be said to rest under a similar legal obligation to exercise the utmost care in the pursuit of their trade.

As we view the evidence in its entirety, the jury would be justified in finding that in the exercise of ordinary prudence and elementary common sense the defendant should have grounded the control box before energizing it with 440 volts of electricity; that the defendant's failure to ground the box created a dangerous condition of which it was fully aware; that the defendant failed to inform Mr. Byers that the box was ungrounded and failed to warn him that it had been left in a highly dangerous condition; that after the workmen left the Byers' lease they never did return to complete the work of grounding the box, although the Hesston firm rendered a bill for the job.

Findings to the foregoing effect inhere in the jury's general verdict, for it must be assumed that the controverted issues of fact were resolved in favor of Mrs. Byers, the prevailing party. (*Phillips v. Hartford Accident & I. Co.,* 157 Kan. 581, 588, 142 P. 2d 704.) A general verdict imports a finding on all the issues in a case which are not inconsistent with the answers to special questions submitted, and such special questions are to be so construed, if possible, as to bring them into harmony with the general verdict. (*Lord v. Hercules Powder Co.,* 161 Kan. 268, 272, 167 P. 2d 299; *Giltner v. Stephens,* 166 Kan. 172, 180, 200 P. 2d 290.) We discern no irreconcilable conflict between the findings and the verdict in this case.

In line with what we have heretofore said, we cannot fault the jury's finding of wanton conduct on defendant's part, and the judgment must be affirmed.