No. 54,224

EDGAR DALE KEARNEY and HELEN C. KEARNEY, d/b/a PIER I IMPORT ASSOCIATES, INC., *Plaintiffs/Appellees/Cross-Appellants,* and Consolidated Cases JOHN H. MOORMAN, Administrator of the Estate of JOHN GORDON MOORMAN, Deceased, and JOHN H. and GENEVA SMITH MOORMAN, LEROY MCDERMOTT, DOUGLAS COUNTY STATE BANK, Administrator of the Estate of MICHAEL M. COLLEY, Deceased, and JOHN V. and MILDRED G. COLLEY, RALPH N. WOLFSON and CHARLES WOLFSON, BRIMAN'S LEADING JEWELERS, INC., JOHN T. LEE, ROUND CORNER DRUG COMPANY, INC., LESLIE SCHULTZ, CLARE JENNINGS, LARRY D. JOHNSON and PEGGY L. JOHNSON, d/b/a JENNINGS DAYLIGHT DONUTS, *Plaintiffs/Appellees,* v. KANSAS PUBLIC SERVICE COMPANY, *Defendant/Appellant/Cross-Appellee,* and E. I. DU PONT DE NEMOURS & COMPANY, INC., and DRESSER INDUSTRIES, INC., *Defendants/Appellees.*

(665 P.2d 757)

Opinion filed June 10, 1983.

*Glenn McCann,* of Knipmeyer, McCann, Fish & Smith, of Kansas City, argued the cause, and *Justice B. King,* of Fisher, Patterson, Sayler & Smith, of Topeka,

and *Olin Petefish,* of Petefish, Curran & Immel, of Lawrence, were with him on the briefs for Kansas Public Service Company, appellant/cross-appellee.

*John W. Lungstrum,* of Stevens, Brand, Lungstrum, Golden & Winter, of Lawrence, argued the cause and was on the brief for Edgar Dale Kearney and Helen C. Kearney, appellees/cross-appellants.

*Charles D. McAtee,* of Eidson, Lewis, Porter & Haynes, of Topeka, argued the cause and *Anne L. Baker,* of the same firm, was with him on the briefs for E. I. du Pont de Nemours & Company, Inc., appellees.

*Jerome V. Bales,* of Wallace, Saunders, Austin, Brown and Enochs, Chartered, of Overland Park, argued the cause and was on the briefs for Dresser Industries, Inc., appellees.

The opinion of the court was delivered by

HOLMES, J.: *Kearney, et al v. Kansas Public Service Company, Inc., et al,* case No. 54,224, (hereinafter referred to as *Kearney* or the *Kearney* case), and the ten cases consolidated with it in this appeal, grew out of a natural gas explosion which occurred in Lawrence, Kansas, in the early morning hours of December 15, 1977. The explosion claimed two lives and caused serious personal injuries along with extensive property damage. Fourteen separate lawsuits were filed by various plaintiffs against the Kansas Public Service Company, Inc. (KPS), E. I. du Pont de Nemours and Company, Inc., (du Pont), and Dresser Industries, Inc. (Dresser). Two cases were settled by KPS and are not germane to this appeal. One of the cases was partially tried, then settled by KPS. The instant *Kearney* case was tried and resulted in a verdict placing 100% of the fault upon KPS and awarding actual damages of $97,066.42 and punitive damages of $80,000.00. Of the remaining ten cases, eight were settled between KPS and the plaintiffs and two are still pending. Subsequent to settlement of the eight cases KPS filed cross-claims in each case against du Pont and against Dresser for comparative indemnity. There have been no cross-claims filed in the two cases which are still pending in district court. However, after the jury verdict in *Kearney,* du Pont and Dresser were granted summary judgments in the two pending cases and the eight settled cases. Since the *Kearney* jury found du Pont and Dresser to be without fault in the unfortunate accident, the court found no genuine issues of material fact remaining upon the plaintiffs' claims or the KPS cross-claims. KPS appeals from the *Kearney* judgment as well as the summary judgments in the ten other cases consolidated with it on appeal.

KPS is a one-city public utility company which supplies

natural gas to its customers in Lawrence. Du Pont is the manufacturer and distributor of a polyethylene plastic pipe called Aldyl "A," which was used in the KPS gas distribution system. Du Pont also manufactures and distributes a metal insert pipe stiffener to be used with its pipe. Dresser is the manufacturer and distributor of a compression coupling called the Dresser 90 which was also used in the KPS system. The several lawsuits each alleged that KPS, du Pont and Dresser were at fault in the accident. In none of the suits is the comparative fault of the plaintiffs an issue. Mr. and Mrs. Kearney were the owners of a Pier I Imports business located at 747 Massachusetts Street in the City of Lawrence.

Sometime prior to June, 1975, KPS decided to replace some of its existing metal gas lines with plastic pipe. The plastic pipe involved in this case was a two-inch pipe snaked through the existing three-inch steel casing beneath the paved alley behind the Kearneys' place of business. At one end the plastic pipe had to be connected to the existing steel gas main. The transition joint joining steel to plastic was accomplished by means of a five-inch-long Dresser 90 compression coupling. The coupling device allowed the insertion of two and one-half inches of plastic pipe from one end and two and one-half inches of steel from the other. A metal insert stiffener is used to prevent the plastic pipe from being crushed when a compression coupling is applied and tightened around the pipe. It is not clear whether it was a du Pont stiffener which was actually used in this case. The installation was designed, made, owned, operated and maintained by KPS and was originally completed on June 2, 1975. This was not the first installation of this type made by KPS.

The run of the plastic pipe from the steel main was three hundred ninety-four feet. It is undisputed that unsecured plastic pipe will expand or contract in length about one inch for every one hundred feet with any ten degree change in temperature. When the pipe is installed directly in the ground, with earth tamped along its length, the degree of contraction and expansion is reduced. With the use of proper anchoring devices the plastic pipe can be prevented from pulling out of the coupling.

The explosion leading to these lawsuits occurred when the plastic pipe contracted due to the cold weather and pulled free of the compression coupling. The gas then escaped from the steel

main and migrated through the ground and accumulated in the nearby buildings. At about 1:20 a.m. on December 15, 1977, the gas exploded and burned causing death, personal injury and extensive property damage. It appears to be conceded by all parties that if the plastic pipe had been properly anchored, it would not have contracted and pulled free from the compression coupling and the explosion would not have occurred.

We will first consider the issues in the appeal by KPS from the *Kearney* judgment. KPS raises a number of arguments and issues which basically fall into four general categories. First, KPS claims that the trial court erred in its instructions on the duty of du Pont and Dresser to warn KPS on the proper use of their products and in its instructions on the alleged design defects of their respective products. Second, KPS contends the trial court made evidentiary and procedural errors which affected the jury findings as to du Pont's and Dresser's liability. Third, it claims error with respect to the actual damages and, last, error with respect to the punitive damages. The Kearneys have cross-appealed, claiming the court erred in refusing to grant treble damages under K.S.A. 66-176 and in refusing to grant prejudgment interest.

KPS contends that the court should have instructed that du Pont and Dresser were under a duty to warn KPS of the possible dangers involved in using their products in the manner utilized by KPS. The evidence revealed that the Dresser 90 coupling was not, by itself, designed to prevent pullouts from longitudinal shrinking due to temperature changes. It was contemplated and recommended that if the run of plastic pipe was to be extensive then proper anchoring devices should be used with the coupling to prevent contraction and expansion due to temperature changes. KPS sought to shift the blame for the tragedy to du Pont and Dresser by claiming the information furnished was insufficient to advise KPS of the dangers involved. KPS contends the trial court should have instructed the jury that du Pont and Dresser were under a duty to warn KPS unless they knew KPS was actually aware of the specific dangers involved. The trial court instructed the jury that du Pont and Dresser were under a duty to warn unless KPS knew or should have known of the existing dangers. There are two flaws in the KPS argument. First, the evidence was clear that KPS was actually aware of the

specific dangers involved and had been adequately forewarned. Second, the contention of KPS has recently been resolved to the contrary in *Mays v. Ciba-Geigy Corp.*, 233 Kan. 38, 661 P.2d 348 (1983). We find no error in the trial court's instructions on the duty of du Pont and Dresser to warn KPS.

Next, KPS contends error in the trial court's instruction on design defects. KPS argues the du Pont pipe was defective when sold without the appropriate anchoring devices recommended by both du Pont and Dresser. It claims the pipe was, per se, unreasonably dangerous when sold without the other products required to properly install the pipe. The trial court instructed the jury in detail about the contentions of the various parties and also instructed on defective products in language generally following that recommended in PIK Civ. 2d. It appears clear that the use of plastic pipe for transmission of gas is not inherently dangerous when properly installed. In view of the warnings and instructions furnished KPS and its actual knowledge of the dangers involved if the pipe was not properly anchored when installed, we find no error in the design defect instructions.

KPS contends it was error for the trial court to admit in evidence a report of the National Transportation Safety Board about a similar gas explosion which occurred in Fremont, Nebraska, on January 10, 1976, nearly two years before the Lawrence explosion. The Fremont disaster involved a hotel which was destroyed from an almost identical situation as in the instant case. KPS argues there were too many dissimilarities in the two events, and that the compression coupling was not a Dresser 90, that the report was hearsay, that its prejudicial impact far outweighed its probative value and, finally, that the use of the report was contrary to 49 U.S.C. § 1903(c). The report was received in evidence for the limited purpose of showing KPS was on notice that its type of installation was hazardous. The court instructed the jury that:

"Evidence has been admitted in this case concerning a gas explosion which occurred in Fremont, Nebraska, on January 10, 1976. This evidence has been admitted on this issue of whether the Kansas Public Service Company had notice or knowledge of the alleged cause of the Fremont, Nebraska, incident. You should only consider such evidence for that limited purpose."

The Fremont explosion involved the same kind of du Pont pipe utilized with a compression coupling to make the plastic-

to-steel transition joint. The Fremont installation was made without the recommended anchoring devices, the run of plastic pipe in both cases was in excess of three hundred feet, both installations were made in hot summer weather with the pipe contracting and pulling loose from the compression coupling in cold winter weather. The report was clear notice of the possibility of a pullout due to contraction of plastic pipe if it is not properly anchored. The report was not hearsay as it was not admitted to prove the truth of the statements contained therein but solely for the limited purpose of showing notice to KPS. Neither was the use of the report contrary to 49 U.S.A. § 1903(c), which prohibits the use of such reports in litigation "growing out of any matter mentioned in such report." The Lawrence litigation obviously did not grow out of any matter mentioned in the Fremont report. While there is no doubt the report was damaging to KPS, we find no error in its admission for the limited purposes of which the jury was properly instructed. K.S.A. 60-406.

Next, KPS claims error in the testimony of Mr. Keith Chen, an expert witness for du Pont. After Mr. Chen had been cross-examined at length by counsel for KPS, attacking his credibility as a paid, professional witness for du Pont, he was asked on redirect examination whether he had testified in some of the Fremont, Nebraska, cases. An objection to the general question was overruled. When he replied in the affirmative, he was then asked and allowed to answer without objection as to the specific results of those trials which had been favorable to du Pont. The parties are not in agreement whether the initial objection of KPS constituted a contemporaneous objection to the specific question as required by K.S.A. 60-404. In any event, following an immediate conference at the bench, the court instructed the jury as follows:

"The Court: Members of the jury, you are instructed that the last answer given by Mr. Chen concerning the results of any trials that may have occurred or the trial that occurred about Fremont, Nebraska, the objection is sustained to that statement and you are instructed to disregard any statement that he made in that regard. It is not a part of this case and should have no bearing on your consideration of the facts in this case."

Assuming arguendo the limited and untimely objection of KPS was sufficient and that the evidence was inadmissible, the error was not reversible error. In *Cherry v. State Automobile Insurance Association,* 181 Kan. 205, 310 P.2d 907 (1957), we stated:

"Assuming, as he contends, it was error to introduce such testimony in the first instance, we are unable to concur in his view respecting the force and effect of the court's instruction. The books are full of cases holding that an instruction to disregard testimony erroneously admitted cures what might otherwise afford sound ground for reversal of the judgment." p. 211.

The statements by Mr. Chen constituted harmless error, at best.

Early in the trial, Arthur C. Barney, an investigator for the Kansas Corporation Commission, testified on behalf of the plaintiffs. On cross-examination KPS was precluded from eliciting testimony as to the custom and usage in the gas industry in the use of compression couplings for joining plastic pipe to steel. Custom and usage in the same field is usually relevant on the issue of negligence. *Garst v. General Motors Corp.*, 207 Kan. 2, 484 P.2d 47 (1971). However, we find no reversible error in this case. KPS made no proffer of the evidence they hoped to present through Mr. Barney (K.S.A. 60-405), and later in the trial Mr. Robert Allison, plant superintendent for KPS, was allowed, over objection, to testify about the widespread usage of compression couplings in the industry. In addition, KPS could have called Mr. Barney when presenting its case in chief but did not choose to do so.

Next, KPS contends it was error to exclude evidence that it intended to comply with certain state and federal regulations. The Kansas Corporation Commission has adopted certain federal regulations pursuant to K.S.A. 66-1,150 in order to be in conformance with the natural gas pipeline safety act of 1968 (49 U.S.C. § 1671 *et seq.*). KPS wanted to show that it had complied with many of the regulations but the court ruled that such evidence must be limited to the subject of anchoring this type of installation and the relevant minimum safety standards pertaining thereto. Again, there is no proffer showing what portions of the Code of Federal Regulations KPS wanted to place in evidence and the court's ruling that only regulations relevant to the issues in the case would be admissible was correct. The fact that KPS had complied with numerous federal regulations would have no relevance to its negligence in this case unless the regulations related to the issues in the case.

In the opening stages of the trial, the court set some ground rules to assure an orderly presentation of the evidence and examination of the witnesses. The order of examination of each witness was direct examination by plaintiffs, followed by cross-

examination by KPS, du Pont and Dresser, in that order. Following cross-examination by all three defendants, plaintiffs were then permitted redirect examination followed again by re-cross-examination by KPS, du Pont and Dresser. The re-cross-examination was limited to the scope of the redirect examination. KPS claims that its re-cross-examination should not have been limited to the scope of the redirect examination but should have included the right to cross-examine each witness on matters developed by du Pont and Dresser in their original cross-examinations. The theory of KPS is that the plaintiffs, du Pont and Dresser had teamed up to put the blame on KPS and unless KPS was allowed the right to cross-examination based upon what du Pont and Dresser elicited from each witness, it was being deprived of a fair trial. The fact that actions based upon comparative negligence create adversary proceedings among the defendants is the inevitable result of the change from the doctrine of contributory negligence to the present one of comparative negligence. Under contributory negligence the defendants, ordinarily, enjoyed a community of interest in that one of the principal objectives was to prove the plaintiffs contributorily negligent in some degree. If the defendants, working in concert, could accomplish that then all the defendants were ordinarily freed of liability. Under comparative negligence, each defendant must fight his own battle and attempt to convince the trier of facts that not only the plaintiffs, but also the other defendants are the real culprits. As a result, the comparative negligence doctrine has converted what used to be a cooperative effort on the part of the defendants into an adversarial relationship.

In the instant case the petition and pretrial order reflect that plaintiffs were asserting serious claims of negligence against du Pont and Dresser, although it must be conceded that the main thrust of their attack was against KPS. The procedure adopted by the trial court does not appear to have been unduly restrictive or prejudicial to the rights of KPS. If there were specific areas of examination which KPS desired to inquire into and which were precluded by the order and limitations placed on cross-examination, KPS could always recall the witness during its case in chief. In *Manley v. Rings*, 222 Kan. 258, 564 P.2d 482 (1977), we stated:

"Generally the relevancy of testimony elicited by a party from any witness and the scope of both direct and cross-examination of that witness is subject to reasonable control by the trial court. Exercise of reasonable control by the court will not constitute reversible error absent a showing of abuse resulting in prejudice." p. 261.

The scope of cross-examination lies within the sound discretion of the trial court and no abuse of that discretion has been shown in this case. See *Lemons v. St. John's Hospital of Salina,* 5 Kan. App. 2d 161, 613 P.2d 957 (1980).

Next, we turn to the various issues raised by KPS in attacking the jury's award of actual and punitive damages. KPS first attacks the jury's award of $37,406.00 for loss of profits while plaintiffs' business was closed and its award of $8,154.00 for loss of future profits. Dr. Darwin Daicoff, a professor of economics at the University of Kansas, testified as an expert witness on behalf of the plaintiffs. Plaintiffs' business had been in operation for several years and had an established record of profitability. In addition, Mr. and Mrs. Kearney testified as to the financial history of the business. Following the disastrous explosion of December 15, 1977, plaintiffs' business was closed until August 15, 1979. The new location was not as desirable as the former one and therefore Mr. Daicoff projected that the net earnings of the business would be reduced during the ten-year period from August, 1979, to August, 1989. KPS objects to the testimony of Dr. Daicoff alleging he used an unrealistic formula and failed to consider certain essential factors in reaching his conclusions as to lost profits, past and future, and therefore the testimony was speculative and should not have been admitted. In *Vickers v. Wichita State University,* 213 Kan. 614, 518 P.2d 512 (1974), we said:

"Unquestionably, a method of establishing a loss of profits with reasonable certainty is by showing a history of past profitability. Past profitability of a particular business is not, however, the only method of proving lost future profits. The evidence necessary in establishing lost future profits with reasonable certainty 'must depend in a large measure upon the circumstances of the particular case. . . .' (Requirements of Certainty of Proof of Lost Profits, 64 Harv. L. Rev. 317, 319.) Absolute certainty in proving loss of future profits is not required. (22 Am. Jur. 2d, Damages, § 172.) What is required is that the court or jury be guided by some rational standard. (*Brenneman v. Auto-Teria, Inc.,* 260 Or. 513, 491 P.2d 992; *Smith Development Corp. v. Bilow Enterprises, Inc.,* 112 R.I. 203, 308 A.2d 477; *Mechanical Wholesale, Inc. v. Universal-Rundle Corp.,* 432 F.2d 228 [5th Cir. 1970].) As to evidentiary matters a court should approach

each case in an individual and pragmatic manner, and require the claimant furnish the best available proof as to the amount of loss that the particular situation admits. (McCormick, Law of Damages, § 29 [1935].) It is the responsibility of a district court to see that speculative and problematical evidence does not reach the jury. (*Peterson v. Bachar,* [193 Kan. 161, 392 P.2d 853 (1964)]." p. 620.

There was sufficient evidence to furnish a rational standard and basis for the expert testimony. The trial court has wide discretion in allowing the testimony of expert witnesses and the use of such testimony ordinarily goes to the weight thereof and not its admissibility. *Schaeffer v. Kansas Dept. of Transportation,* 227 Kan. 509, 520, 608 P.2d 1309 (1980). KPS, by cross-examination, had the right to attack the credibility of Dr. Daicoff and the accuracy of his opinions and was free to fully go into what it perceived to be deficiencies in the testimony. The jury's award of past and future lost profits is supported by substantial evidence and will not be disturbed on appeal. *Marcotte Realty & Auction, Inc. v. Schumacher,* 229 Kan. 252, 624 P.2d 420 (1981).

Next KPS alleges error in permitting recovery of actual damages for loss of fixtures, equipment, furniture, supplies, and miscellaneous other personal property. KPS contends there was no evidence of the market value of the personal property at the time of the loss. To the contrary Mr. Kearney consistently testified as to the fair market value as of the date of the loss. In addition, the jury was properly instructed that any such loss must be in terms of the "fair and reasonable market value of the property immediately before its destruction." No error is shown. See *Ultimate Chem. Co. v. Surface Transp. Int'l, Inc.,* 232 Kan. 727, Syl. ¶¶ 2, 4, 658 P.2d 1008 (1983).

KPS also asserts it was error for the court to accept the jury's verdict awarding $2,900.00 for loss of leasehold improvements for the reason that such improvements became the property of the landlord, could not have been removed by plaintiffs and, therefore, plaintiffs had no compensable loss. No contemporaneous objection was made to the testimony of Mr. Kearney as to the loss and value thereof and therefore the issue is not properly before this court for review. K.S.A. 60-404. Even if the issue could be said to be properly before the court, we find no error. Plaintiffs expended money for leasehold improvements which could have been used throughout their tenancy if the property

had not been destroyed and, therefore, the improvements did have an ascertainable value to plaintiffs.

Finally, as to actual damages, KPS asserts there was error in the award for expenses of relocating and reopening when a portion of such damages were duplicative of other damages allowed and included the cost of new improvements and assets. The total amount sought by plaintiffs was $6,386.03 and the jury allowed $4,586.03, thereby reducing the amount claimed by $1,800.00. We have no way of knowing which expenses of relocating and reopening were allowed and which were not. The amount awarded by the jury is supported by the evidence and no error is shown.

Next, KPS raises several arguments attacking the award of punitive damages in the amount of $80,000.00. Initially KPS contends it was error to submit the issue of punitive damages to the jury because there was no evidence of wilful, fraudulent, malicious or wanton conduct necessary to support punitive damages. We do not deem it necessary to detail at length the extensive evidence to the effect that KPS knew long before the Lawrence explosion that their method of utilizing the du Pont pipe and Dresser compression coupling could result in longitudinal contraction and pullout with temperature changes. KPS had previously experienced pullouts of plastic pipe from compression couplings in October and December of 1975. Officials of KPS testified they had considered the problem, discussed it, but failed to take any action to install the recommended anchoring devices. As early as July of 1974, representatives of Dresser warned KPS of the dangers involved in the type of installation being utilized by KPS and attempted to convince KPS that it should use anchoring devices. The evidence was clear that proper anchoring devices will secure the pipe in place thus preventing contraction and pullout. KPS was specifically put on notice by the Fremont report and by two subsequent letters from du Pont that anchors should be used to make the installations safe. The evidence was more than sufficient to establish wanton disregard of the known consequences of the type of installations utilized by KPS. The issue was properly submitted to the jury. See *Byers v. Hesston Appliance, Inc.*, 212 Kan. 125, 509 P.2d 1151 (1973).

KPS asserts the trial court erred in its instructions to the jury because the instructions did not advise the jury relative to the

intentions of KPS. Under the massive evidence adduced in this case we find no error in the instructions. The issue of punitive damages was submitted to the jury on the wanton conduct of KPS and not on the basis of any wilful act of that defendant.

KPS next contends it was error to preclude it from showing its good faith attempt to comply with the Code of Federal Regulations and that it actually did comply with the bulk of them. Compliance with regulations unrelated to the cause of the accident involved is not relevant to whether there was a wanton violation of other relevant regulations. KPS also claims error in the failure to allow it to show that it had not been cited by the Kansas Corporation Commission for any violation in connection with the explosion. The fact KPS was not cited for violations is irrelevant to the determination of the actual conduct of KPS.

KPS complains it was error to allow the defendants to introduce evidence of its net worth for the years 1979 and 1980 in addition to 1981. KPS acknowledges that the financial condition of a defendant is a proper factor to take into consideration in awarding punitive damages but contends evidence thereof should be limited to the financial condition at the time of trial. Because the financial data of KPS during the time of trial was limited and incomplete, information of its financial condition for the two preceding years was allowed. No abuse of discretion in the allowance of such evidence has been shown.

It is also contended that the punitive damage figure was grossly excessive due not only to the admission of the evidence as to the financial condition of KPS in 1979 and 1980, but also due to the inflated and erroneous actual damages. We have already determined there was no error in the actual damages awarded by the jury or in the admission of the 1979 and 1980 financial data. As to the punitive damages being excessive, the argument lacks merit. We have, on several occasions, approved punitive damage awards several times in excess of the actual damages. *Ettus v. Orkin Exterminating Co.,* 233 Kan. 555, 665 P.2d 730 (1983), $410 actual damages, $10,000 punitive damages; *Sampson v. Hunt,* 233 Kan. 572, 665 P.2d 743 (1983), $20,000 actual damages, $600,000 punitive damages; *Ultimate Chem. Co. v. Surface Transp. Int'l, Inc.,* 232 Kan. 727, $102,000 actual damages, $227,000 punitive damages; *Henderson v. Hassur,* 225 Kan. 678, 594 P.2d 650 (1979), $48,000 actual damages, $215,000 punitive damages. In the instant case, the award of

punitive damages was actually less than the actual damages sustained by the plaintiffs. Considering the evidence in this case and the total failure of KPS to heed the numerous warnings or to take any corrective action when it was known a dangerous condition existed, the amounts awarded in this case do not shock the conscience of this court. *Henderson v. Hassur*, 225 Kan. 678, Syl. ¶ 11.

We now turn to the cross-appeal of the plaintiffs wherein they assert error in the failure of the trial court to triple the jury award pursuant to K.S.A. 66-176, and in failing to grant prejudgment interest. We find no error in either ruling of the trial court. As to the claim for prejudgment interest the general rule is "that an unliquidated claim for damages does not draw interest until it becomes liquidated—usually by judgment." *Lightcap v. Mobil Oil Corporation*, 221 Kan. 448, 466, 562 P.2d 1, *cert. denied* 434 U.S. 876 (1977). See also *Geier v. Eagle-Cherokee Coal Mining Co.*, 181 Kan. 567, 313 P.2d 731 (1957); *Columbian Fuel Corp. v. Panhandle Eastern Pipe Line Co.*, 176 Kan. 433, 271 P.2d 773 (1954). Plaintiffs' reliance on *Lightcap* is misplaced. There are no unusual circumstances in the present case which would justify prejudgment interest on the unliquidated claim of plaintiffs.

K.S.A. 66-176 provides:

"Any public utility or common carrier which shall violate any of the provisions of law for the regulation of such public utilities or common carriers shall forfeit, for every offense, to the person, company or corporation aggrieved thereby, three times the actual damages sustained by the party aggrieved, together with the costs of suit, and a reasonable attorney fee, to be fixed by the court; and if an appeal be taken from the judgment or any part thereof, it shall be the duty of the appellate court to include in the judgment an additional reasonable attorney's fee for services in the appellate court or courts."

That statute has been on the books since 1883 and was last revised in 1923. It appears that no Kansas appellate court has ever had occasion to interpret, apply or consider the statute although it was mentioned along with others in the early case of *Interstate Com. Commission v. Railway Co.*, 167 U.S. 479, 497, 42 L.Ed. 243, 17 S.Ct. 896 (1897). It is the position of the plaintiffs that the statute applies to the damages recovered in this case. They contend that K.S.A. 66-1,150, which reads:

"The state corporation commission is hereby authorized to adopt such rules

and regulations as may be necessary to be in conformance with the natural gas pipeline safety act of 1968 (49 USCA 1671 *et seq.*). For the purpose of gas pipeline safety such rules and regulations shall be applicable to all public utilities and all municipal corporations or quasi-municipal corporations rendering gas utility service, the exemption provisions of K.S.A. 66-104, 66-131 and related statutes notwithstanding. Nothing in this section shall be construed as invalidating any present rules or regulations of the state corporation commission, concerning the regulation of pipelines and pipeline companies."

requires the triple penalty provisions of K.S.A. 66-176 to be applied to any violation of the regulations adopted under the authority of K.S.A. 66-1,150. Kansas has adopted the regulations as contemplated by the statute to bring Kansas into compliance with the federal act. There is also no doubt but that KPS was in violation of the regulations in the instant case as they apply to the requirement for anchoring installations such as the one involved here.

K.S.A. 66-104 provides in pertinent part:

"Except as herein provided, the power and authority to control and regulate all public utilities and common carriers situated and operated wholly or principally within any city or principally operated for the benefit of such city or its people, shall be vested exclusively in such city, subject only to the right to apply for relief to the corporation commission as hereinafter provided in K.S.A. 66-133 and to the provisions of K.S.A. 66-131a."

K.S.A. 66-133 and -131a are not relevant to the issue before the court. KPS is a one-city gas public utility within the provisions of K.S.A. 66-104 and is therefore subject to regulation only by the City of Lawrence except as otherwise specifically provided by statute. K.S.A. 66-1,151 and 66-1,152 provide specific penalties for violations of 66-1,150 and vest in the Kansas Corporation Commission the power to administer such penalty provisions. It is to be noted that 66-1,150 specifically provides that it shall be applicable to all gas public utilities notwithstanding the exemption provisions of K.S.A. 66-104. However, K.S.A. 66-176 does not contain a similar provision and K.S.A. 66-1,150 does not mandate that 66-176 shall be applicable to violations of the regulations adopted pursuant to 66-1,150. K.S.A. 66-176 is penal in nature and is to be strictly construed and should not be expanded by implication. 82 C.J.S., Statutes § 389, pp. 922-927. In the instant case a violation of the regulations contemplated by K.S.A. 66-1,150 is specifically made applicable to one-city gas public utilities such as KPS. K.S.A. 66-176 contains no language

indicating that it is to override the specific exemption from regulation contained in K.S.A. 66-104 and nothing in the legislative history of any of the statutes indicates any such intent. The adoption of K.S.A. 66-1,150 *et seq.*, in 1970 did not automatically subject KPS to the provisions of K.S.A. 66-176 or to other statutes from which it is exempt under K.S.A. 66-104. The trial court was correct in its determination that K.S.A. 66-176 does not apply to KPS.

As no reversible error has been shown, the judgment in the *Kearney* case must be affirmed.

We now turn to the appeal of KPS in the ten consolidated cases. In these cases, KPS contends the trial court committed error in sustaining motions for summary judgment in favor of du Pont and Dresser in each case. As pointed out earlier in the opinion, KPS settled with the plaintiffs in eight of the cases and thereafter filed cross-claims against du Pont and Dresser. Two cases are still pending and the only claims asserted against du Pont and Dresser in those were by the plaintiffs. The trial court held that no genuine issues of material fact existed after the jury determination in *Kearney* found du Pont and Dresser to be without fault. None of the ten plaintiffs has appealed the granting of summary judgment and there are no issues before the court as to the original claims of the plaintiffs against du Pont and Dresser in any of the cases. The trial court found that the doctrine of collateral estoppel or issue preclusion was applicable in each of the ten cases. KPS has appealed.

KPS contends the granting of summary judgment on the basis of collateral estoppel was improper because of (1) a lack of mutuality of the parties, (2) a lack of adversarial pleadings among the defendants in *Kearney,* and (3) *Kearney* had not been finally determined. As *Kearney* has now been finally determined adversely to KPS, the third argument of KPS is found to be moot. We will direct our attention to the holdings of the trial court that the jury verdict in *Kearney* established and settled the respective liability of KPS, du Pont and Dresser for all the cases. At the outset KPS contends that as the trial court refused to grant du Pont and Dresser summary judgment before the trial in *Kearney,* then in spite of the jury verdict in *Kearney,* the same issues of material fact exist in the remaining ten cases as were originally present in *Kearney,* and that collateral estoppel does not apply.

KPS relies on *Williams v. Evans*, 220 Kan. 394, 552 P.2d 876 (1976), wherein we held:

"The doctrine of collateral estoppel may be invoked as a bar to litigating an issue when the following is shown: (1) a prior judgment on the merits which determined the rights and liabilities of the parties on the issue, based upon ultimate facts as disclosed by the pleadings and judgment; (2) the parties are the same or in privity; and (3) the issue was actually determined and was necessary to support the judgment.

"Parties are not bound by a judgment in a prior action in which they were co-defendants except on issues as to which they were adverse parties. To be 'adverse parties' they must be arrayed on opposite sides of the issue, which must be raised by appropriate cross-pleadings between the defendants themselves, so that each may have control of the proceedings to enable him to exhaust the question of liability *inter se*. It is not enough that they, by their separate answers, deny liability and claim that the accident was due to the negligence of the other." Syl. ¶¶ 2, 3.

It is the position of KPS that as the plaintiffs in each case are different there is no mutuality of estoppel and as there were no cross-claims or adversary pleadings filed by the codefendants in *Kearney,* the requirement of "adverse parties" during the *Kearney* trial is lacking. It appears KPS now desires to contend, for the purposes of avoiding collateral estoppel, that the defendants in the *Kearney* case were not adversaries while its position on many of the points in the *Kearney* appeal was that du Pont and Dresser had ganged up on KPS and were actually adversaries to the position of KPS. We think KPS was correct in its position in the *Kearney* appeal, that the codefendants were actual adversaries and that all issues of liability of the three defendants, *inter se,* have now been determined.

As we indicated earlier, the advent of comparative negligence had the practical effect of placing codefendants in an actual adverse position as to each other regardless of the filing of cross-claims or other adversarial pleadings among the codefendants. In *Kearney* the record discloses the extreme adversary nature of the trial proceedings as to the defendants, *inter se,* even though no cross-claims were on file. In the ten consolidated cases the discovery record reflects the same adversary positions. Although the absence of cross-pleadings was noted in *Williams* in support of the court's denial of collateral estoppel, that decision must be considered in light of its specific facts which occurred prior to comparative negligence. In many situations the adoption of comparative negligence has rendered the procedural

requirement of adversarial pleadings unnecessary for the doctrine of collateral estoppel to apply in a later case where the codefendants in the earlier case were in .an actual adverse position as to each other and proceeded to trial in that manner. Numerous authorities have recognized and adopted this position. In Comment, *Comparative Negligence in California: Multiple Party Litigation,* 7 Pac. L.J. 770, 805 (1976), the author states:

"Some decisions rendered before the adoption of comparative negligence have held that a prior finding of negligence on the part of joint tortfeasors does not affect a later suit for contribution. The rationale of these cases is that the liability of the defendants *inter se* was not litigated in the first case wherein the joint judgment was rendered. Thus, in the contribution suit, the tortfeasors are free to litigate their relative liability on the judgment because the doctrine of collateral estoppel does not apply. *The rule of these cases should be inapplicable under a comparative negligence system.* Unlike the situations posed in the pre-comparative negligence cases, the proportionate liability of the parties would have been at issue in the first suit if specific findings were made as to the liability of each party. *Therefore, if all parties to the contribution suit participated in the first case, the prior determination of their relative negligence should be made conclusive under the doctrine of collateral estoppel.*" (Emphasis added.)

Several jurisdictions have found the requirement of cross-pleadings unnecessary when it is evident from the record in the prior action that the interests of the codefendants in the prior action were adverse, and that the issues as to which collateral estoppel is asserted were litigated in an adversary setting. *Hopson v. Triplett,* 380 F. Supp. 1169 (E.D. Okla. 1974); *Nickert v. Puget Sound Tug and Barge Company,* 335 F. Supp. 1162 (W.D. Wash. 1971); *Schwartz v. Public Administrator,* 24 N.Y.2d 65, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969); *Gleason v. Hardware Mutual Casualty Co.,* 324 Mass. 695, 88 N.E.2d 632 (1949). See also Annot., 24 A.L.R.3d 318. In the present cases KPS states in its brief:

"In each case consolidated herein on appeal the allegations of fault as against the defendants Kansas Public Service Company, Du Pont and Dresser, are virtually identical to the allegations made in the *Kearney* case."

The Restatement (Second) of Judgments has now recognized that adversity under formal pleading, such as cross-claims, in the first action is not always a prerequisite to the applicability of issue preclusion in a subsequent action. The Restatement (Second) of Judgments § 38 (1980), states:

"Parties who are not adversaries to each other under the pleadings in an action involving them and a third party are bound by and entitled to the benefits of issue preclusion with respect to issues they actually litigate fully and fairly as adversaries to each other and which are essential to the judgment rendered." p. 378.

Comment *a* to § 38 states:

"[P]arties aligned on the same side in the pleadings may be drawn into controversy between themselves on an issue that is at the same time material to their rights or obligations regarding their common adversary and to rights and obligations subsisting between them. Thus, defendants sued by a plaintiff who has stated a claim against them in the alternative may defend not only by disputing the plaintiff's case but by adducing proof and argument against each other. . . . In such circumstances, the co-parties may have an opportunity and incentive to litigate the issues arising between them that is equivalent to that between parties whose opposition is defined through pleadings." p. 379.

In *Eurich v. Alkire,* 224 Kan. 236, 579 P.2d 1207 (1978), the facts were stated as follows:

"This is an interlocutory appeal from an order granting summary judgment in favor of plaintiff Orlan L. Eurich, Jr., on the issue of liability in an action seeking recovery for personal injury.

"This is the second of two cases arising from a two-car crash on February 24, 1975, in Great Bend, Kansas. One car was driven by Bonnie Faris and the other car contained Eurich and Wesley D. Alkire, the defendant herein.

"The first lawsuit was instituted by Faris against Eurich and Alkire. In her petition she alleged she did not know who was driving but claimed both defendants were intoxicated and the driver was negligent. Each defendant filed a separate answer alleging the other to be the driver and himself to be a sleeping passenger. At pretrial plaintiff Faris amended her petition alleging that if the owner of the car, Alkire, was not driving he was guilty of negligent entrustment for allowing Eurich to drive when he knew Eurich was intoxicated. At trial the jury answered special verdicts finding Eurich was the driver at the time of the accident. Damages to plaintiff were $50,000, and fault was 40% attributable to Eurich and 60% to Alkire for negligent entrustment.

"This case was filed before the trial of the first lawsuit. Following the decision in the first case, Alkire moved for summary judgment in the instant case. On July 30, 1976, the district court granted judgment on liability, holding that the jury's findings in the first case controlled. Because of our decision in *Williams v. Evans,* 220 Kan. 394, 552 P.2d 876 (1976), decided only one week prior to the trial court's decision herein, Alkire moved for reconsideration. In *Williams* we held that a prior judgment against codefendants does not activate the doctrine of collateral estoppel as to liability between the defendants, pointing out that the question of liability between the defendants was not put in issue in the prior case. The trial court held *Williams* was not applicable." pp. 236-37.

This court pointed out that *Williams* was tried prior to the adoption of comparative negligence and held the second action barred. We said:

"[W]e believe it was the intent of the legislature to fully and finally litigate all causes of action and claims for damage arising out of any act of negligence subject to K.S.A. 60-258a. The provision for determining the percentage of causal negligence against each person involved in a negligence action contemplates that the rights and liabilities of each person should be determined in one action. *Because all issues of liability are determined in one action there can be no reasonable argument that the issues should be relitigated.* Likewise, there is no reasonable argument for the proposition that a claim for damage arising out of one collision or occurrence should not be presented at the time negligence is originally determined. . . .

"We conclude that all persons who are named as parties and who are properly served with summonses are bound by the percentage determination of causal negligence." 220 Kan. at 238.

The fact that there were no cross-claims or adversarial pleadings on file among the defendants in *Kearney* does not preclude the application of the doctrine of collateral estoppel where the codefendants were actual adverse parties.

We hold that in a comparative negligence action where codefendants actually occupy adversary positions, they may be subsequently bound by the determination of their respective degrees of negligence or fault even though adversarial pleadings may not have been filed at the time of trial of the first action.

KPS next assets that the requirement of mutuality of parties does not exist because there are different plaintiffs in the ten cases. *In none of the cases was there any assertion that any of the plaintiffs were at fault in any way and the only issue of liability for trial was the degree of fault of the three codefendants. Thus mutuality of parties does exist on the issue of the respective liability of KPS, du Pont and Dresser as among themselves.* That liability has been finally determined in the *Kearney* case and is binding upon KPS, du Pont and Dresser in all other litigation growing out of the same occurrence.

*Hammond v. The Nebraska Nat. Gas Co.,* 204 Neb. 80, 281 N.W.2d 520 (1979), was one of the cases which grew out of the Fremont explosion. The plaintiff recovered damages against Nebraska Gas Company and its codefendant du Pont was held blameless.

*Peterson v. The Nebraska Nat. Gas Co.,* 204 Neb. 136, 281 N.W.2d 525 (1979), was also one of the cases resulting from the Fremont, Nebraska, explosion. Peterson was the owner of a business building which was damaged in the Fremont explosion

and fire. He filed suit against the Nebraska Natural Gas Company, du Pont and others. After the trial in *Hammond* but before the same had been appealed, the plaintiff Peterson filed a motion for partial summary judgment. That motion was sustained by the trial court on the basis that after *Hammond* there remained no genuine issue of material fact in regard to the issues of negligence and proximate cause, and that the doctrine of collateral estoppel or issue preclusion was applicable to the defendant gas company. In its decision, the Nebraska Supreme Court first noted the right of a court to examine its own records and take judicial notice of its own proceedings and judgment in a prior action, where cases are interwoven and interdependent, and the controversy involved has already been considered and determined in a prior proceeding involving one of the parties before the court.

Concerning the contention of the Nebraska Natural Gas Company that collateral estoppel was not applicable because of the lack of mutuality, the court said:

"Generally, mutuality of estoppel is no longer considered to be a requirement for the application of collateral estoppel. It is now generally held that collateral estoppel may be applied if the identical issue was decided in a prior action, there was a judgment on the merits which was final, the party against whom the rule is to be applied was a party or in privity with a party to the prior action, and there was an opportunity to fully and fairly litigate the issue in the prior action. See, *Bernhard v. Bank of America,* 19 Cal. 2d 807, 122 P.2d 892; *Teitelbaum Furs, Inc. v. Dominion Ins. Co., Ltd.,* 58 Cal. 2d 601, 25 Cal. Rptr. 559, 375 P.2d 439; *Blonder-Tongue v. University Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788; *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552. The trial court has some discretion as to whether collateral estoppel may be invoked in a particular case. *Parklane Hosiery Co., Inc. v. Shore, supra;* Restatement Second, Judgments, (T.D. No. 3), § 88, p. 161.

". . . .

"The judgment in the *Hammond* case was final for the purposes of collateral estoppel even though the defendant perfected an appeal to this court. See *Kometscher v. Wade,* 177 Neb. 299, 128 N.W.2d 781; Restatement Second, Judgments, (T.D. No. 1), § 41, p. 2.

". . . .

"The record in the *Hammond* case establishes that the defendant had a full, fair, and complete opportunity to litigate the issues of negligence and proximate cause, and that in fact those issues were fully and fairly litigated.

"We conclude that the partial summary judgment against the defendant was properly granted." 204 Neb. at 139-40.

In the trial of the *Kearney* case all defendants fully litigated the issues of their respective liability and that case has now been

finally determined. *Under the facts of these cases where there were no claims by any defendants in any of the cases that any of the plaintiffs were negligent or at fault and the only issues thereon were among the three codefendants, there existed mutuality and identity of the parties sufficient to invoke collateral estoppel in the later cases.* We are not called upon and do not here decide whether mutuality of estoppel is still a valid requirement for the application of the doctrine of collateral estoppel in other cases.

The record in *Kearney* clearly shows that KPS, du Pont and Dresser had a full, fair and complete opportunity to litigate the issue of negligence and that in fact that issue was fully and fairly litigated. There is no need to do it again. The trial court did not commit error in granting summary judgment in the ten consolidated cases in favor of du Pont and Dresser on the basis of collateral estoppel based upon the decision in *Kearney*, where there were no issues of possible liability by any of the plaintiffs or any other parties other than the three codefendants. Under the factual situation which existed in *Kearney* and the ten consolidated cases, the factors to invoke collateral estoppel are present. We make no determination of the applicability of the doctrine of collateral estoppel when other parties, such as the various plaintiffs in the present cases, are alleged to have been negligent.

The judgments in *Kearney* and the ten consolidated cases are affirmed.