No. 46,047

AIRIGHT SALES, INC., *Appellant,* v. GRAVES TRUCK LINES, INC., *Appellee.*

(486 P. 2d 835)

Opinion filed July 16, 1971.

*Richard H. Rumsey,* of Wichita, argued the cause and was on the brief for the appellant.

*Robert C. Foulston,* of Foulston, Siefkin, Powers, Smith and Eberhardt, of Wichita, argued the cause, and *Mikel L. Stout* and *Jerry C. Elliott,* of the same firm, were on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: The sole issue in this appeal is the proper measure of damages to be awarded where certain airplane parts owned by plaintiff-appellant were partially destroyed in a shipment as a result of the conceded negligence of defendant-appellee, a common carrier.

Trial was to the court, which entered judgment in favor of the plaintiff for the amount which it had paid for the entire lot of parts, plus the cost of salvaging that portion which was not damaged beyond repair. Plaintiff appeals, contending the judgment was inadequate.

The evidence and the contentions of the parties are well summarized by the trial court's findings of fact and conclusions of law:

### "FINDINGS OF FACT

"1. Prior to July 18, 1967, plaintiff ordered from Huctrol, Inc., Kingston, New York, certain airplane parts for use in the hydraulic system of the Cessna 210 Airplane, consisting of 161 Spindles, 19 Body Assemblies and 135 Piston and Rod Assemblies. Huctrol, Inc., had purchased these items from the original

manufacturer through a bankruptcy proceeding in the State of New York. All of these parts were packed by Huctrol in one container weighing in excess of 700 pounds, and shipped these parts in the one container by truck to plaintiff in Wichita. The defendant carrier picked up this one container of aircraft parts in Kansas City from another truck line for delivery to plaintiff in Wichita, Kansas. The container was delivered to plaintiff's place of business about 8:30 a. m. on July 18, 1967, at which time it was raining. There being no facilities at plaintiff's place of business to unload the container, an employee of plaintiff instructed the driver of defendant's truck to take the container back to the defendant's dock and that it would be picked up that afternoon. The evidence reflects that plaintiff's employee drove a van-like truck to defendant's dock about 2:30 p. m., and at that time the container was loaded into plaintiff's truck. The evidence is that the container had been sitting on an open dock prior to the time it was picked up by plaintiff's employee, and that it had gotten extremely wet.

"2. The testimony reflects that plaintiff's employee drove the van back to plaintiff's place of business and parked the van inside where he left the container on the van, and opened the doors of the van and let a fan blow on the container. July 18, 1967, was a Tuesday, and the evidence reflects that the president of plaintiff returned from a business trip on Friday afternoon, and that the container was opened on the next day, Saturday, when the damage to the parts was discovered. The loss to the parts was caused by moisture resulting from rust and pitting of certain parts, and of the total shipment 33 Spindles, all 19 of the Body Assemblies and 92 of the Piston and Rod Assemblies were damaged to the extent that they were damaged beyond repair and could not be used for the purpose for which they were manufactured.

"3. The evidence reflects that all of the parts ordered and purchased by plaintiff were overrun parts manufactured by Electrol, Inc., the bankrupt company from which Huctrol, Inc., bought these parts. The evidence further reflects that Huctrol, Inc., desired to discontinue the handling of this type of merchandise, and this company sold all of these aircraft parts to the plaintiff for the sum of $100.00, and that they were shipped to plaintiff in an 'as is' condition.

"4. Plaintiff introduced evidence of sales of these parts in 1961 through 1962, attempting to establish a market price at that time in the amount of $5,547.98. Plaintiff also introduced testimony that the replacement cost of the items damaged as of April 16, 1969, would be $9,713.00 and that the cost of replacing these parts in July, 1966 [1967?], would be a sixty percent of this figure or $5,827.80. The evidence further reflected that plaintiff expended $136.00 to salvage those parts which were not damaged beyond repair, and which plaintiff still has in its possession and in a usable condition. The evidence further reflected the plaintiff sold two Spindles on January 27, 1969, at $52.50 each, this being the only sale of any of the usable parts it had made from July 17, 1967, to the date of trial on April 17, 1969.

"5. The evidence reflects that the parts ordered and purchased by plaintiff for $100.00 were surplus replacement parts for the Cessna 210 Airplane manufactured by Cessna during the period 1959 through 1961, and that from 800 to 900 of this particular model aircraft was manufactured by this company. No

evidence was introduced as to how many of this particular model were in service and still flying in July, 1967.

### "CONCLUSIONS OF LAW

"1. The Court finds that 33 Spindles, 19 Body Assemblies and 92 Piston and Rod Assemblies were damaged beyond repair, and that the damage was caused by the negligence of the defendant in allowing the container containing these parts to be exposed to the rain while it was in its possession.

"2. The only question to be resolved is the amount of damages to be awarded to plaintiff for this loss. Plaintiff contends that the loss should approximate either the market price of these items as sold by Electrol, Inc., in 1960, 1961, and 1962, or by the replacement value as testified to by its expert, Mr. Joseph P. Orth, these amounts ranging from $5,547.98 to $5,827.80, the defendant contending that the purchase price is what the damages should be confined to as paid by the plaintiff for these items in the amount of $100.00 and possibly the amount of money expended by plaintiff to salvage the parts not damaged and which it now has in its possession.

"3. The Court is of the opinion that to award plaintiff replacement costs of these parts or a value based upon sales made in 1960, 1961, and 1962, would be allowing plaintiff recovery for loss of profits which would be uncertain, conjectural and highly speculative. The evidence reflected that only one sale of two of these parts had been made by plaintiff in the 20 month period from July, 1967, to April, 1969, the date of the trial, and no evidence was offered by plaintiff upon which the Court could make any reasonable assumption that there was and would be a market for the sale of these parts, except possibly on a very occasional basis. The general rule is in this type of action that lost profits will be allowed only if there is loss proved with a reasonable degree of certainty.

"4. The rule is stated in 22 Am. Jur. 2d, Par. 172, at p. 243 as follows: 'As thus indicated, this is primarily a problem of proof, the complaining party being required to submit sufficient proof of the loss of profits so that the trier of fact can find with reasonable certainty the fact and amount of lost profits. No recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative. Thus, no recovery can be had for loss of profits where it is uncertain whether any profit at all would have been made by the plaintiff.'

"5. The Court is of the opinion that judgment should be entered for damages for the plaintiff and against the defendant in the amount of $236.00, being the purchase price of all of the parts purchased by plaintiff and the cost of salvaging the items that were not damaged beyond repair and now in plaintiff's possession, realizing that plaintiff still has the use and benefit of the remaining Spindles and Piston and Rod Assemblies."

Appellant's contentions are renewed here that it should have recovered either market or replacement cost. Although the two are closely interrelated under the facts in this case, we shall deal with them in order.

As we read the trial court's conclusions they are pregnant with the concept that appellant failed to show that there was any market

for the damaged parts in 1967. The sales in 1960, 1961, and 1962 were rejected as being too remote in time to establish a market in 1967, and the isolated sale in 1969—the only one in twenty months—was regarded as insufficient to establish a market "except possibly on a very occasional basis." This amounts to a finding that, on this issue, appellant failed to meet its burden of proof. Such a negative finding is binding on this court on appellate review, since we cannot say that it was arbitrary or capricious. See *American Housing & Investment Co. v. Stanley Furniture Co.*, 202 Kan. 344, 449 P. 2d 561.

In reaching this conclusion the trial court was applying textbook law. Thus,

"Market value means, generally, the price for which an article is bought and sold, and is ordinarily best established by sales in the ordinary course of business. In order for it to be said that a thing has a market value, it is necessary that there shall be a market for such commodity—that is, a demand therefor and an ability from such demand to sell the same when a sale thereof is desired. Where, therefore, there is no demand for a thing and no ability to sell the same, then it cannot be said to have a market value, and the recovery in such case is generally its actual value or, as in the case of portraits, heirlooms, etc., its value to the owner." 22 Am. Jur. 2d, Damages, § 146, p. 212.

See also 25 C. J. S., Damages, § 88.

As the above authorities recognize, lack of market value is not necessarily fatal to a claim for substantial compensatory damages for the destruction of property (although it proves to be here). We recognized this as early as *Atchison, T. & S. F. R. Co. v. Stanford*, 12 Kan. * 354, Syl. ¶ 6. And see *Hollinger v. Railway Co.*, 94 Kan. 316, Syl. ¶ 4, 146 Pac. 1034. We have said:

"Generally speaking, it may be said that one whose property is negligently destroyed by another is entitled to recover the actual loss sustained. . . . If there be no market value, then another criterion of value must be found, and the best evidence which can be obtained must be produced to show the elements which enter into the real value." *Kennedy v. Heat and Power Co.*, 103 Kan. 651, 652-653, 175 Pac. 977, 7 A. L. R. 274.

We do not deem a treatise on the law of damages necessary to the disposition of this case. An extension annotation on the measure of damages for conversion or loss of, or damage to, personal property having no market value appears at 12 A. L. R. 2d 902. See also, 25 C. J. S., Damages, §§ 88-90; 22 Am. Jur. 2d, Damages, §§ 148-151. Factors considered as relevant to damages where no "market" obtains include cost of repair, original cost, "intrinsic" value, loss of use, any special value to the owner, the loss of expected profits, and the cost of replacement. Only the last two concern us here.

Reproduction cost, the measure urged by appellant here as an alternative to market value, is considered relevant where property has some unique quality making it particularly valuable to the owner. See generally anno., 12 A. L. R. 2d 902, § 5. The rule seems to be particularly applicable to items having an intimate, even sentimental, relationship to the owner, and to ships, dredges, machine tools and dies, and similar items constructed for a particular purpose and used in producing revenue. Indeed, we have held as to such an item—a specially constructed truck—that loss of anticipated profits may be added to the value of the property, *if* such loss is reasonably ascertainable and is not "speculative or problematical." *Peterson v. Bachar*, 193 Kan. 161, 392 P. 2d 853. Compare *Billups v. American Surety Co.*, 173 Kan. 646, 251 P. 2d 237, where evidence of anticipated profits from a damaged truck was held properly excluded because too remote. As the court below correctly noted, the primary problem in this area is one of proof.

At this point the finding of "no market," or lack of proof, deals a mortal blow to appellant's alternative theory.

The trial court's conclusion that to award replacement cost would amount to an award of profits, while not fully articulated, is soundly premised. The airplane parts had no special value or usefulness to appellant nor any revenue producing character except as part of its stock in trade. If appellant recovered replacement cost it would in effect have made a sale of the parts to the appellee when, as the trial court found, on the basis of the evidence produced the prospect of a sale to any other customer was highly speculative. It seems improbable that if appellant were to recover replacement cost it would in fact replace the parts and indulge in such speculation. While this factor would not militate against recovery for an item having special value to the owner—such as custom made furniture or wearing apparel—it is relevant where the items are simply inventory having no market value.

The story that springs from the record is that appellant's president went bargain hunting, and thought he had found one in this distress merchandise. The trial court obviously viewed appellant's venture as a low risk flier in which, if one or two sales were forthcoming, it would recoup its entire cost. Any additional sales would be pure gravy. As to a substantial portion of the merchandise appelant is still in that position, having made one sale for more than its total investment and having in addition been awarded its full

purchase price for the entire lot by the trial court. If it could be converted into an immediate sale of the balance of the lot, the fortuitous rain would be not mere moisture but manna from heaven.

It is true that the result we reach deprives appellant of a portion of its speculative position in this particular commodity. However, it still owns, at no cost, a substantial portion of the merchandise. If the sanguine expectations of appellant's president prove to be justified it will still reap a substantial profit. Had it proved a reasonable basis for those expectations at trial the harvest would already be in. If, on the other hand, the merchandise merely gathers dust in appellant's warehouse, it will be no worse off than if it had never embarked on the venture. On the record made below we think this is as advantageous a position as it might expect.

Appellant urges that if there is to be a windfall it should not go to the wrongdoer but to the injured party. We would agree, if there is to be a windfall. An award of damages, however, is not designed to afford either party a windfall but to compensate for injuries suffered and proved. We think the trial court's judgment did just that, and it is therefore affirmed.

APPROVED BY THE COURT.