No. 53,997

ULTIMATE CHEMICAL COMPANY, *Plaintiff-Appellee,* v. SURFACE
TRANSPORTATION INTERNATIONAL, INC., *Defendant-Appellant.*

(658 P.2d 1008)

Opinion filed
February 19, 1983.

*Brent L. Brown,* of Stinson, Mag & Fizzell, of Kansas City, Missouri, argued
the cause, and *John M. Edgar* and *Stephen J. Owens,* of the same firm, and
*George Maier, Jr.,* of Weeks, Thomas & Lysaught, Chartered, of Kansas City,
Kansas, were with him on the briefs for the appellant.

*Frank J. Murphy,* of Hillix, Brewer, Hoffhaus & Whittaker, of Kansas City,
Missouri, argued the cause, and *R. Dennis Wright,* of the same firm, and *Joel K.
Goldman,* of Schnider, Shamberg & May, of Shawnee Mission, were with him on
the brief for the appellee.

The opinion of the court was delivered by

PRAGER, J.: This is an action to recover damages for trespass
brought by the plaintiff, Ultimate Chemical Company (UCC),
against the defendant, Surface Transportation International, Inc.
(STI). Briefly stated, plaintiff alleged, and the jury in its verdict
found, that employees of STI came upon certain land in Kansas
City, Kansas, which was under lease to UCC, and destroyed

equipment owned by UCC. UCC had leased the property at 2300 State Line Road from Patek Enterprises. The lease continued in existence through December 1, 1978. STI, which was in the business of renovating railroad cars, became interested in using the property for that purpose. In October of 1978, Patek leased a large tract, which included the property previously leased by Patek to UCC. Prior to entering into the lease, Robert Patek explained to the president of STI that Patek had previously leased a part of the land to UCC and that UCC would be given 30 days' notice so as to vacate the premises by December 1, 1978.

The evidence established that, while the plaintiff's lease was still effective, employees of STI entered on the land to construct a railroad track. In clearing the land, STI employees used bulldozers in pushing certain items of plaintiff's equipment out of the area of work and plaintiff's equipment was damaged and destroyed. Thus, the evidence was overwhelming, if not undisputed, that STI trespassed on plaintiff's leased property and caused damage to plaintiff's property. Plaintiff sued seeking both compensatory and punitive damages. The amount of damages, which was based on the value of plaintiff's equipment, was highly disputed. The case was tried to a jury. It awarded plaintiff UCC $102,000 actual damages and $227,000 punitive damages. Defendant STI appealed.

The defendant's first point on the appeal is that the trial court erred in refusing to allow STI to conduct a cross-examination of Thomas Williams, President of Ultimate Chemical Company, concerning UCC's past profit and loss record and its financial statement. We find this point to be without merit. The trial court had previously ruled that the measure of damages to be applied for the items of equipment of personal property damaged was the difference in value of the equipment before and after the damage occurred. At one time, the plaintiff had asserted a claim for lost profits, but the trial court excluded any such claim on the basis that UCC was engaged both in the sale of equipment and of chemicals from two separate places of operation and that, therefore, evidence of the prior financial record of the company was irrelevant. As noted above, the trial court restricted the plaintiff's evidence to a measure of damages based upon the value of the property destroyed at the time and place of its destruction. At the trial UCC president Williams took the witness stand and testified

as to each item of personal property which had been damaged by the defendant's employees. He testified as to the items of equipment damaged, the date of acquisition and cost of each item, and then gave his opinion as owner as to the fair market value of the property at the time the loss occurred based on a certain percentage of markup. Williams testified that none of the items of personal property had any value to UCC *after* the damage occurred. On cross-examination, defense counsel was allowed a full scope of examination on the *issue of value.* The trial court refused, however, to permit defense counsel to cross-examine the witness as to the overall profit and loss record of UCC in past years. We have concluded that, under the circumstances set forth above, the trial court correctly excluded evidence of UCC's profit and loss record in past years. Since UCC was limited by the trial court to proof of the fair market value of the equipment destroyed by STI, evidence of the profit and loss record of UCC in past years was not material.

The next two points raised on the appeal are somewhat overlapping and, in substance, take the position that the compensatory and punitive damages awarded by the jury were excessive to a degree that the trial court should have granted either a new trial or a remittitur. As to the compensatory damages the measure of damages submitted to the jury in the case was the fair market value of the plaintiff's property at the time the property was damaged. Mr. Williams, as owner, testified that the value of the property prior to its loss was $128,856 and that the property was worthless after it was damaged. The rule of damages generally followed in this state is that when personal property cannot economically be restored to its former condition, the measure of damages is the difference between its fair and reasonable market value immediately before and immediately after the damage. See PIK Civ. 2d 9.11 (1977); *Foster v. Humburg,* 180 Kan. 64, 299 P.2d 46 (1956); *Lester v. Doyle,* 165 Kan. 354, 356, 194 P.2d 917 (1948). In an action for trespass, the plaintiff may be awarded damages which are the immediate consequence of the trespass. The wrongdoer should compensate for all the injury naturally and fairly resulting from his wrong. *Mackey v. Board of County Commissioners,* 185 Kan. 139, 147, 341 P.2d 1050 (1959).

The fair market value of the damaged equipment in this case, according to Williams, the owner of UCC, was in the amount of

$128,856. The rule is well established that the owner of property is presumed to know its value and his opinion of its value is competent, and may be considered by the jury. *Fox v. Wilson,* 211 Kan. 563, 582, 507 P.2d 252 (1973); *Geselle v. American Home Fire Assur. Co.,* 146 Kan. 138, 68 P.2d 1097 (1937); *Brenneisen v. Phillips,* 142 Kan. 98, 100, 45 P.2d 867 (1935). The defendant STI introduced testimony of witnesses who said the property was worthless and had no value before the damage occurred. This is not surprising, for one man's treasure is often another man's junk. In this case, it was up to the jury to determine the damages suffered by the plaintiff. The plaintiff's witness Williams, as noted above, testified that the property was worth in excess of $128,000. The jury awarded actual damages in the amount of $102,000. We are not inclined to second-guess the jury, as there is competent evidence in the record to support compensatory damages in that amount, nor can we say as a matter of law that the award was excessive.

We now turn to the issue of punitive damages. It has long been the law of Kansas that exemplary or punitive damages may be recovered in an action for trespass when the trespasser has been guilty of malice, wantonness, or oppression. *Hefley v. Baker,* 19 Kan. 9 (1877). See also *Garcia v. Southwestern Bell Tel. Co.,* 216 Kan. 591, 533 P.2d 1242 (1975). We have no hesitancy in holding that the evidence in the record in this case justified an award of punitive damages by the jury. The evidence showed clearly that, prior to the execution of the lease between Patek and STI, Patek told the president of STI that UCC had a lease on a portion of the land included in the lease. Patek went to the property on two separate occasions with STI employees and pointed out to them the specific property which was under lease to UCC. Thus, STI had complete and actual knowledge of the UCC lease before STI entered into its lease with Patek and before STI employees trespassed on UCC's leased premises. In late October or early November of 1978, STI started clearing the leased property to make room for a railroad track. In so doing, "it just happened to go right through UCC's 'junk'" as STI's president described it. A number of witnesses testified that they saw STI employees bulldoze UCC's equipment during the month of November, 1978. Mr. Williams testified that he wrote STI a letter on November 14, 1978, asking STI to stop its bulldozing. He also

telephoned STI's president three or four times. The letter and telephone calls were never answered or returned, and the trespassing continued. Under these circumstances there was sufficient evidence of actual knowledge and of a willful and wanton destruction of property to justify a substantial award of punitive damages.

We next turn to the question of whether the award of punitive damages in the amount of $227,000 was excessive. Punitive damages are imposed by way of punishing a party for malicious or vindictive acts or for a willful and wanton invasion of another party's rights, the purpose being to restrain him and to deter others from the commission of like wrongs. In assessing punitive damages, the nature, extent, and enormity of the wrong, the intent of the party committing it, and all circumstances attending the transaction involved should be considered. A jury may also consider the amount of actual damages recovered, defendant's financial condition, and the probable litigation expenses. Generally, the trial court will not be reversed for refusing a new trial because of the size of the verdict unless the amount of the verdict in the light of the evidence shocks the conscience of the court. *Henderson v. Hassur*, 225 Kan. 678, 594 P.2d 650 (1979). Under all the factual circumstances in this case, we cannot say that the amount of the punitive damages awarded by the jury in this case was so excessive as to shock the conscience of the court.

The defendant next maintains that the trial court erred in admitting into evidence certain photographs of the UCC leased property taken in 1977, approximately one year before the trespass occurred. A witness testified that the photographs accurately portrayed the condition of the property before the defendant's employees entered on the land in mid-November of 1978. This testimony was the only foundation required for their admission into evidence. *Landrum v. Taylor*, 217 Kan. 113, 535 P.2d 406 (1975).

The defendant next complains that the trial court erred in refusing to give an instruction concerning defendant's claim that it had a privilege to enter upon the premises. There was no evidence to show that defendant had any privilege to trespass on the UCC leased property. In our judgment, the trial court properly refused the requested instruction.

We have considered the other points raised by the defendant STI on appeal and find them to be without merit.

The judgment of the district court is affirmed.

FLOYD H. COFFMAN, District Judge, Assigned, dissenting: The majority sustains a jury verdict for compensatory damages in the total amount of $102,000.00 supported only by the property owner's opinion of total damage of $128,856.97 and Exhibit 34 which lists forty-two items on a schedule with five columns. This exhibit was prepared for this litigation and therefore has no probative value.

The format of Exhibit 34 is exemplified by the following extract:

| "Property | Date Acquired | Acquisition Cost | Fair Market Value Prior to Loss, Damage |
|---|---|---|---|
| . . . . | | | |
| 34. Contents of above tanks* | 9/19/74 | included in price of steel storage tanks | $37,500 [hand written-explained below] ~~$1.10/gal-lon~~ |
| 35. 1 Continental truck* | 10/—/77 | $1,500.00 | $3,450.00 |
| . . . . | | | |
| 41. 2-500 gal. pfaud-ler glass lined and jacketed for pressure chemical reactors with 1,000 gal. mixed acid | 2/07/75 | this equip. was part of a group of equip. pur-chased for $17,500.00 | 40,116.00 (total) |
| 42. 2-pfaudler glass lined tanks | 9/18/74 | 330.00/ea. | 1,000.00/ea. $128,856.97" |

A fifth column on the exhibit headed "Fair Market Value After Damage and Loss," not listed above, carried the comment as to each of the 42 items: "This property was without value to Ultimate Chemical Company after damage or loss." It is noted that this column which would total zero for the forty-two items listed is not the proper test of value of salvage items after the damage. The proper test even then is market or salvage value generally and not value to the owner (Ultimate Chemical) as listed.

Exhibit 34 which included the adding machine tape totaling the before loss value column as $128,856.97 was marked first as

Exhibit 30 after being identified by Williams as a list he made personally in November showing the damaged equipment. Immediately before it was marked and identified, in response to a question by his counsel as to whether he made an attempt to determine what equipment was damaged by STI, the plaintiff Williams replied:

"Well, when, as we cleaned up the area and got into, the [sic] got into the area where the damage was done, we started making a listing of what was there and what, near as we could tell, what was in this pile and what was in that pile and what was tipped over in this tank and so forth. We made a very rough, rough, estimate of our damages. It was a very rough one."

An envelope containing probably 200 pieces of paper was marked as Exhibit 31 and identified by Williams as being cancelled checks and cash receipts relating to the acquisition cost of some of the items listed on Exhibits 30-34 as well as estimates of cost of new equipment as to certain of the items.

Exhibit 34, the list of 42 items with an overall total "before loss value" shown by the attached tape to be $128,856.97, and Exhibit 31, the envelope containing "probably 200 pieces of paper" identified generally as referring to acquisition costs or values of items of property listed on Exhibit 34, were admitted over objection of defendant's counsel.

In plaintiff's testimony on direct examination, he was not asked to testify regarding the market value of any of the separate items listed on Exhibit 34, nor was any evidence offered as to the basis used for fixing the values assigned to each item. The only oral testimony by plaintiff on direct examination as to damages was to recite the total of $128,856.97 as shown by the tape introduced, which amount counsel instructed him to write on the exhibit in longhand.

It was only by cross-examination that any explanation was made by Williams to the court and jury as to how any of the after loss value figures were arrived at. He acknowledged that some of the after loss values were arrived at by using some factor like 2.31 to five times; some were established by getting estimates on new tanks and equipment and a different method was used for chemicals, but it was never explained. On some items he used a factor of 2.31; on some a higher factor was used and on some he didn't use a factor at all.

Referring to Exhibit 34 Williams was cross-examined as to

items 34, 35 and 41 (extracted above for convenience). Item 35 listed "1 Continental truck" acquired more than one year earlier in October for the listed price of $1,500.00 and was given a market value of $3,450.00 on the exhibit. This truck was missing from the lot in November, 1978, when the list was made. Upon purchase the truck had apparently been towed to the lot; it had not been started during the year, and still had no battery in it. Upon being asked by the cross-examiner if Exhibit 34 "indicates that the fair market value prior to loss was $3,450.00." Williams responded: "That's what I have there." He was then asked if he had a title to the truck and he responded: "Well, that was not an over-the-road truck. It was a tractor used on private land and it is not customary to have a title with anything like that."

Item 41 on Exhibit 34 extracted above listed two 500 gallon Pfaudler glass lined and jacketed tanks for pressure chemical reactors with 1,000 gallons of mixed acid acquired February 7, 1975, as part of a chlorosulfation process purchased for $17,500.00 from DeSoto Steel which had been used by Procter and Gamble and was found for plaintiff by B & G Wrecking. This $17,500.00 acquisition included four 6,500 and two 2,200 gallon tanks all with insulation intact, several pump motors, and other equipment. Some of these tanks were manufactured by Pfaudler about 1951. Williams agreed that the market value of $40,116.00 listed for item 41 "is actually the cost of, is reflected from a 1981 price quotation" for new tanks.

Also extracted from Exhibit 34 is item number 34 as contents of above tanks which on the typed copy had a market value of "$1.10/gallon." As this itemized list was being introduced as Exhibit 34 with the adding machine tape totaling $128,856.97, the record reflects that Williams was permitted to correct an error made by the typist, or whoever it was, by striking through "$1.10/gallon" and writing above it in longhand "$37,500." Thus, Williams' damage figure of $128,856.97 included $37,500.00 without one word of testimony about what was contained in the tanks which were acquired September 19, 1974, how the figure of $37,500.00 was arrived at, and indeed whether there was a present market for the contents which had obviously set on the 2300 State Line lot for more than four years.

The only other item from Exhibit 34 regarding which Williams was cross-examined was No. 5 which was not abstracted above. It

was listed as "Base for Jib Crane," acquired June 12, 1974 for $250.00. Although the market value assigned by Williams was $899.00, he testified that this value was for the overall jib crane which he had never used in his business and had not sold after owning it four years.

A careful reading of the 255-page trial transcript in this case has convinced me that plaintiff's claim for $128,856.97 was submitted upon the bare statement of Williams, as owner, as to the total damage arrived at by totaling the figures inserted by him on his list prepared during November and December, 1978, for use in litigation or, hopefully, negotiation. If such an itemization of damages is marked as an exhibit and used during trial, its use must be limited to assisting counsel, the court and the jury (in a jury case) in following the testimony and building a record that can be followed and understood later by court and counsel and, if necessary, on appeal. Without use of such a schedule or exhibit, interpretation of a transcript becomes impossible where more than a few items are involved.

Failure to require the plaintiff to present testimony as to the estimate of market value of each or most of these 42 dissimilar items as well as the facts and knowledge forming the rational or reasonable basis for his opinion results in the burden of disproving plaintiff's lump sum claim being shifted from plaintiff to defendant. Such procedure is not permitted by the Kansas cases beginning with *Roberts v. County of Brown,* 21 Kan. 247 (1878), and repeated in *Town Co. v. Leonard,* 46 Kan. 354, 357, 26 Pac. 717 (1891), as quoted in *McGrew v. Investment Co.,* 106 Kan. 348, 353, 187 Pac. 887 (1920), as follows:

"'It is the function of the court or jury trying the case to determine from evidence properly presented what the amount of damages sustained is, and while it might be very convenient for the plaintiff to permit him and his witnesses to give the damages suffered in a lump, it would be a very unsafe practice to allow them to state the amount of damages supposed to be sustained, without regard to the facts or knowledge upon which their opinions were based. It is well settled that the practice is not permissible. (*Roberts v. Comm'rs of Brown Co.,* 21 Kan. *247; *Railroad Co. v. Kuhn,* 38 id. 675; *Town Co. v. Morris,* 39 id. 377; *C.K.&N. Rly. Co. v. Neiman,* 45 id. 533.)' (p. 357.)"

I would reverse and remand on the question of damages only, unless plaintiff is willing to accept a substantial remittitur of something like $45,000.00 leaving intact for plaintiff a recovery of $57,000.00 compensatory damages.

As to punitive damages defendant would be adequately punished, others deterred, and justice served by a reduction to $150,000.00. An award by the jury of $227,000.00 in punitive damages is shocking to my conscience under the record in this case. I believe the jury award of punitive damages under the facts of this case in excess of one quarter million dollars was prompted by sympathy for the plaintiff family corporation and passion after considering Williams' tearful testimony. A better evaluation of the amount of money which would be necessary to punish defendant corporation could be made if evidence of defendant's financial status, probably Exhibit 37, were included in the record on appeal upon timely request of counsel.

McFARLAND, J., joins the foregoing dissenting opinion.