[No. 8811-1-III. Division Three. October 11, 1988.]

THE WASHINGTON WATER POWER COMPANY, *Appellant*, v. ANTHONY MILLER, ET AL, *Respondents*.

*William Schroeder, Diane Hermanson* and *Paine, Hamblen, Coffin & Brooke,* for appellant.

*Richard Feltman, Francis Gebhardt,* and *Feltman, Gebhardt, Eymann & Jones,* for respondents.

THOMPSON, C.J.—Washington Water Power Company (WWP) appeals a judgment awarded it for damages caused by Darrin Miller when he struck WWP's utility pole in his automobile. Darrin and his parents, the owners of the automobile, cross–appeal. At issue is whether the court erred when it (1) denied WWP compensation for indirect costs allocated to replacing the pole and (2) denied the

Millers an allowance for depreciation on the pole. We reverse on the former issue, but affirm on the latter.

In this action, WWP sought reimbursement from the Millers for $633.76, the alleged cost of replacing the pole. The Millers admitted liability, and a trial was held to determine the amount of WWP's damages.

Trial exhibits 2 and 3 set forth WWP's claimed expenses and the manner in which they were calculated. Labor amounted to $198.86 in overtime wages for the 7–man crew dispatched to replace the pole, plus 42.21 percent of that figure, or $83.94, to cover vacation, sick leave, holidays, and other fringe benefits. The crew used three trucks, each was driven 20 miles, and the company charged $2 a mile for a total of $120 transportation costs. Materials came to $190.66. WWP applied an 8.35 percent stores expense of $15.92 to this latter figure to cover the cost of purchasing, transporting, handling, and issuing the materials used out of the storeroom. Another 4 percent overhead charge of $24.38 was applied to the subtotal of $609.38 to cover construction engineering costs. The percentages relative to fringe benefits, stores expense and overhead indicate the proportion each of those items bear to WWP's total labor costs, store issues, and construction engineering costs, respectively, occurring in 1982, the year preceding the accident. The Washington Utilities Commission has approved these formulas. In addition, an independent accounting firm audits the formulas annually.

WWP uses mass asset accounting for its distribution plant, which includes its utility poles. The mass asset concept allows WWP to calculate its costs and to depreciate its assets without maintaining individual records for each item of property. The pole in question was part of WWP's mass asset account 364. The service life for depreciation purposes for account 364 was 35 years, and the damaged pole had been in use for 15 years. However, WWP presented evidence that it replaces poles only when the need arises and that there have been instances of poles lasting as short a time as 6 hours and for as long as 80 years.

Richard Lane, depreciable property analyst for WWP, testified that when WWP receives less than the full replacement cost for a pole, including indirect costs, the company's rate base is changed, and the ratepayers must pick up the difference. On the other hand, Mr. Lane stated on cross examination that WWP's overhead, fringe benefits, and stores expense would have been the same whether or not Darrin had struck the pole. He admitted that the crew sent to replace the pole received overtime wages, and that employees do not accrue vacation or sick leave while on overtime. The defense also presented expert opinion testimony that WWP would be made whole if it recovered its replacement costs, minus 15 years' depreciation.

The trial court held WWP's fixed and continuing expenses had no relationship to Darrin's negligence, and it would not count them as part of WWP's damages. Thus, it awarded WWP only $509.52, the cost of material, transportation, and wages. The court refused to apply any depreciation to that award, reasoning that the Millers had not proved any set life expectancy for the pole, or that the replacement enhanced the value of WWP's distribution system.

## THE APPEAL

Are fringe benefits, stores expense, and overhead proper elements of WWP's damages caused by Darrin Miller's negligence? Serious considerations exist on both sides of this issue.

Every activity of the company shares—theoretically—in producing expenses of administration. Even though a clerk in Peoria has no direct connection with repair of a pole in Springfield, the clerk and others are necessitated by *all* the paper work of the company. His salary and that of others can be considered to be a cost attributable to all activities of the company and it is possible to compute mathematically how much is attributable to a particular operation. Allowance of the proportionate share of overhead costs of the company theoretically is not an allowance of profit, and theoretically it puts a proper share of the costs upon the tortfeasor who had damaged

the property rather than upon the consumers who buy services from the utilities. . . . On the other hand . . . so far as measurable many of the "overhead" costs are fixed and will exist without regard to whether one pole, fifty poles or no poles are damaged, and it is by no means clear that consumers buying services from the utility will be afforded any savings if the tortfeasor shares in fixed overhead charges. Another consideration is the difficulty of dealing with overhead as a practical matter in the trial of a suit. It is complicated and costly to figure, even for the company accountants (whose time is included in general overhead), and it is probably even more complicated for the lawyer who must cross examine company accountants in performance of his responsibility to his client.

D. Dobbs, *Remedies* § 5.12, at 394–95 (1973). *See also* Annot., *Comment Note: Overhead Expense as Recoverable Element of Damages*, 3 A.L.R.3d 689, § 2[b], at 695 (1965).

Since Professor Dobbs wrote his treatise in 1973, the majority of jurisdictions that have addressed the question have come down on the side of allowing indirect costs as a component of damages if the formula used to calculate these costs is accurate. *See, e.g., Cincinnati Bell, Inc. v. Cooper,* 23 Ohio Misc. 2d 9, 491 N.E.2d 411 (1985); *Mississippi Power & Light Co. v. Tillman,* 291 So. 2d 736 (Miss. 1974). "Sufficient accuracy has been found where the overhead calculation was based on sound accounting principles; [or] where the accounting methods used to allocate indirect expenses had been approved by government regulatory bodies". (Footnotes omitted.) *Curt's Trucking Co. v. Anchorage,* 578 P.2d 975, 979 (Alaska 1978). *Cf. Golf Landscaping, Inc. v. Century Constr. Co.,* 39 Wn. App. 895, 900–01, 696 P.2d 590 (1984) (formulas which provide a reasonable basis to measure overhead are an acceptable method of determining such costs for the purpose of a damage action).

An oft–cited rationale by these courts is that a utility must make its own repairs promptly in order to provide a continuous supply of electricity to its customers.

If the utility were to employ an independent contractor to replace damaged poles, the contractor would most certainly consider and include overhead costs in determining the amount to be charged for his work. . . . Overhead expenses incurred by a utility company which makes its own repairs are as much the natural and proximate result of a wrongful acts as if such costs had been passed along to the utility by an independent contractor.

*Duquesne Light Co. v. Rippel,* 329 Pa. Super. 289, 292, 478 A.2d 472, 473–74 (1984). *See also Board of Pub. Utils. v. Fenton,* 669 S.W.2d 612 (Mo. Ct. App. 1984); *Public Serv. Elec. & Gas Co. v. Stone,* 184 N.J. Super. 504, 446 A.2d 578, 582 (1982).

■ We are persuaded by the analysis used by the courts which have allowed indirect costs as an element of damages in these situations. It makes economic sense to recognize that all of WWP's business activities contribute to the need for fringe benefits, stores expense, and overhead. The replacement of damaged poles is part of WWP's business and logically should share in general business expenses.

Thus, we reject the Millers' argument that Darrin's negligence was not the proximate cause of WWP's indirect costs. A plaintiff whose property is damaged as the result of another's negligence is entitled to adequate compensation for the damage. *Burr v. Clark,* 30 Wn.2d 149, 158, 190 P.2d 769 (1948). Here, the property had no market value. Consequently, the measure of damages is the cost of replacement. *Mieske v. Bartell Drug Co.,* 92 Wn.2d 40, 43, 593 P.2d 1308, 6 A.L.R.4th 923 (1979). As shown above, WWP's indirect costs are part of its replacement costs. Since the formulas WWP uses to calculate these expenses are accurate,[1] they are proper components of WWP's damages. We hold that the court erred when it excluded them from the judgment.

In so holding, we note two of the cases the Millers rely upon in their argument against allowing overhead either

---

[1] *I.e.,* the expenses are audited annually and the formulas have been approved by the Washington Utilities Commission.

have been distinguished or questioned by subsequent cases in those jurisdictions. In *Central Ill. Light Co. v. Stenzel*, 44 Ill. App. 2d 388, 195 N.E.2d 207, 212 (1963), the court held such expenses were not a natural consequence of the defendant's negligence. But the court in *Chicago, B. & Q. R.R. v. Ommen*, 130 Ill. App. 2d 713, 715, 264 N.E.2d 535, 536 (1970) differentiated *Stenzel* on several grounds, including the fact that "no . . . formula, custom or practice for determining a measure of damage was offered in evidence by the plaintiff" there. And the holding in *Ohio Power Co. v. Huff*, 12 Ohio Misc. 214, 231 N.E.2d 897 (1967), disallowing overhead, "was rejected and not followed in Ohio within eighteen (18) months of its original pronouncement". *Cincinnati Bell, Inc. v. Hinterlong*, 70 Ohio Misc. 38, 44, 437 N.E.2d 11, 15 (1981).

The remaining cases cited by the Millers were decided without analyzing the two lines of authority. *United States v. Denver & R.G.W. R.R.*, 547 F.2d 1101 (10th Cir. 1977); *South Cent. Bell Tel. Co. v. Gaines Petroleum Co.*, 499 So. 2d 521 (La. Ct. App. 1986); *Public Serv. Co. v. Jasso*, 96 N.M. 800, 635 P.2d 1003 (Ct. App. 1981). The decisions in *Denver* and *Gaines Petroleum* are based on failure of proof rationale rather than rejection of overhead as a recoverable expense in all situations.[2]

### THE CROSS APPEAL

Should WWP's damages be reduced by an allowance for depreciation? The authority most frequently relied upon in support of denying a depreciation allowance in utility pole

---

[2]According to the Millers, WWP also failed to prove vacation pay and sick leave costs were related to its costs of labor to replace the pole. They rely on Mr. Lane's testimony on cross examination that workers on overtime do not accrue those benefits. Here, the crew was on overtime when it replaced the pole.

We believe the Millers' approach begs the question. An overtime worker is simply a regular employee who works beyond a set number of hours. As a regular employee, that worker accrues the benefits in question. Counsel for WWP pointed out in oral argument that the percentage formula used to allocate fringe benefits is determined by the ratio the cost of these benefits bears to *total* labor costs including overtime, not just regular hours.

replacement actions is *New Jersey Power & Light Co. v. Mabee,* 41 N.J. 439, 197 A.2d 194 (1964). There, the court reasoned:

If the life of every pole were 36 years and if it were clear that each pole would be replaced at the end of that period, defendants could well urge that a new pole clearly conferred a benefit beyond the amount of the damage done. The difficulty is that there is no discernible life expectancy of an individual pole and that although the period of 36 years is used for accounting purposes, the pole that was destroyed might well have served for a much longer period and the new pole may last for but a few years. Moreover, because of changes in circumstances or in technology, it cannot be known whether the pole would ever have been replaced. In short, at least upon the record before us, we cannot say with reasonable assurance that the installation of a new pole did more than remedy the wrong done. An injured party should not be required to lay out money, as defendants' approach would require, upon a questionable assumption that one day its worth will be recaptured.

*New Jersey Power & Light Co.,* at 442. *See also Horton v. Georgia Power Co.,* 149 Ga. App. 328, 254 S.E.2d 479, 481 (1979); *Tillman,* 291 So. 2d at 738.

The other view is set out in *Younger v. Appalachian Power Co.,* 214 Va. 662, 664–65, 202 S.E.2d 866, 868 (1974):

The record shows that Appalachian periodically inspects its transmission system and replaces poles deteriorated in normal usage. From this experience, Appalachian can determine the average useful life of poles in the system. Since in the normal course of doing business Appalachian must bear the expense of replacement costs at some reasonably ascertainable future time, recovery from a tortfeasor of full replacement costs at an earlier time would overcompensate the injury sustained. . . . [T]he actual injury sustained by Appalachian is related to the useful life of the pole.

*See also Jasso,* 635 P.2d at 1005.

 Here, the Millers argue WWP had recovered fifteen thirty–fifths of the cost of the pole through depreciation by

the time of the accident.[3] However, the trial court found the damaged pole had no set life expectancy. This finding is supported by the testimony that WWP replaces its poles only when necessary and that its poles last from 6 hours to 80 years. The court's finding in turn supports a conclusion that WWP received no measurable benefit from replacing the pole beyond the immediate benefit of restoring its distribution system.

Testimony relied upon by the Millers that utility poles have an "average" life expectancy of 35 years does not prove this pole would have been in service only 20 additional years. The length of time this pole might have remained in the ground is pure speculation, and speculation does not provide a sufficient basis for damages. *Cf. Riverview Floral, Ltd. v. Watkins,* 51 Wn. App. 658, 663, 754 P.2d 1055 (1988) (claim for lost profits properly denied where speculative). Consequently, we hold the court correctly denied the Millers a credit for depreciation. The facts here are distinguishable from those cases where the utility has a systematic program for replacing poles after a given number of years.

Finally, we deny the Millers' request for attorney fees on appeal. Our holdings eliminate the basis of their request.

The judgment is reversed in part. Judgment should be entered for WWP for $633.76.

GREEN, J., and McINTURFF, J. Pro Tem., concur.

---

[3]They base their argument on the testimony that the pole had been in service for 15 years and the average useful life of a utility pole for accounting purposes is 35 years.