(797 P.2d 162)

No. 64,425

KANSAS POWER AND LIGHT CO., *Appellee*, v.
DEBORAH K. THATCHER, *Appellant*.

Opinion filed August 17, 1990.

*C. Steven Rarrick* and *J. Franklin Hummer*, of Davis, Wright, Unrein, Hummer & McCallister, of Topeka, for the appellant.

*David P. Mudrick*, staff attorney, and *Jeffrey S. Southard*, director of litigation, of Kansas Power & Light Co., of Topeka, for the appellee.

Before BRISCOE, P.J., LARSON and LEWIS, JJ.

LEWIS, J.: This is an appeal by the defendant, Deborah K. Thatcher, from the entry of summary judgment in favor of plaintiff, Kansas Power & Light Co. (KP&L). Finding no error, we affirm.

At issue in this appeal is the proper measure of damages to be applied in this particular factual setting. The case was submitted to the district court on a stipulation of facts agreed to by the parties.

The stipulated facts show that in October 1986 an automobile driven by Thatcher struck and destroyed a wooden electric distribution pole owned by KP&L. Thatcher's liability for damages, if any, is admitted.

The wooden pole damaged was a part of the electrical distribution system owned and operated by KP&L. The pole itself had been in place and used by KP&L for 35 years. KP&L claimed and was awarded damages for the loss of the pole in the amount of $525.14. Thatcher was given no credit or allowance for depreciation of the pole by KP&L.

For tax and accounting purposes, KP&L depreciated its distribution plant poles, towers and fixtures at an annual rate of 3.43 percent. KP&L has no systematic program of replacing poles after a set number of years. Poles are replaced only when that becomes necessary, regardless of age.

The case at issue involves defendant Thatcher, but it is one of four similar cases filed as separate counts in one petition before the trial court. All four defendants had similarly damaged power poles belonging to KP&L, and our decision in this case will be binding as to all four defendants.

The controlling issue on this appeal is whether KP&L can recover the cost of repairing and replacing its 35-year-old utility pole without regard to depreciation.

Thatcher also asserts the evidence does not support the trial court's finding that the utility pole had no discernible life. We do not agree.

While the evidence could have been stronger, we hold the finding of the trial court is supported by substantial competent evidence. The evidence indicates that the *average* age of a utility pole is 35 years and that KP&L depreciates its poles at the rate of 3.43 percent per year. Thatcher insists the evidence shows the life of a pole is 35 years and not indeterminate.

Thatcher has misconstrued the evidence. There is no evidence relating to the actual life expectancy of the pole in question. It is true that the average pole has a life of 35 years, according to

the stipulated facts. However, by its very definition, the term "average" implies that some poles last less than 35 years, some longer. This does not, in any sense, fix the actual life expectancy of an individual utility pole. The average life span of a male in our society is approximately 72 years. This is an example of the use of average age. It obviously does not imply that all males cease to exist upon attaining the average age. We all know people much older than 72, as well as those who never attain that age. The average age of a male tells us no more about how long John Doe will actually live than the average age of a utility pole tells us how long an individual pole will remain in service.

In the absence of any definite evidence as to the actual life span of an individual utility pole, the trial court was free to find that the age of a utility pole is, in fact, indeterminate. In reaching this conclusion, it was not speculating, but based its finding on the evidence and inferences therefrom. We have no difficulty in holding its finding in this regard was supported by the evidence.

If it is impossible to determine the exact life span of a particular utility pole, the concept of using an artificial factor such as depreciation is unreliable as a basis for calculating damages. The pole in question in this case was 35 years old and had been completely depreciated; however, it was still in use, with no plan to replace it, at the time it was hit by Thatcher's automobile. We have no idea how long this particular pole may have remained in use. We can assume, perhaps, that it had many more years of actual useful life to KP&L. If it did, KP&L was forced to make an unscheduled expenditure due to the negligence of Thatcher. It seems reasonable to assess Thatcher with the cost of that expenditure without reduction by an artificial factor such as depreciation. This, we believe, will achieve the most just and equitable result.

We deal here with a variety of possible factual scenarios. In the instant matter, the pole had been in use for 35 years and may have had many more years of useful life. Let us assume, for the sake of argument, that the pole destroyed was only two years old; the damage to KP&L is the same. It must replace and reinstall the pole regardless of its age. Keeping in mind the impossibility of determining how long any individual pole will

remain in service, the fairer method of determining damages is to discard altogether the concept of depreciation.

In attempting to determine the proper measure of damages, we must keep in mind that the item damaged in this case was a wooden utility pole. An attempt to apply the usual rule relating to damage to or destruction of personal property to the facts in this case proves to be impossible. The general rule of damages in cases involving personal property is set out in *Ultimate Chem. Co. v. Surface Transp. Int'l, Inc.*, 232 Kan. 727, 729, 658 P.2d 1008 (1983):

"The rule of damages generally followed in this state is that when personal property cannot economically be restored to its former condition, the measure of damages is the difference between its fair and reasonable market value immediately before and immediately after the damage. See PIK Civ. 2d 9.11 (1977); *Foster v. Humburg*, 180 Kan. 64, 299 P.2d 46 (1956); *Lester v. Doyle*, 165 Kan. 354, 356, 194 P.2d 917 (1948)."

The item damaged in this case is a 35-year-old wooden utility pole designed to be used as part of an electrical distribution system. The record does not show that the wooden utility pole had any market value before or after it was damaged. As a result, the usual rule of damages in cases involving personal property simply cannot be employed because the item damaged in this case has no market value.

The Kansas Supreme Court, in a very early case, *Hollinger v. Railway Co.*, 94 Kan. 316, Syl. ¶ 4, 146 Pac. 1034 (1915), which dealt with an item which had no market value, held as follows:

"The case is the common one in which the property destroyed was not bought and sold on the market, had no market value, and consequently could not be valued by that standard. In such cases the real value is to be ascertained from such data as may be available. Cost is an element of such value, and a person having knowledge of the elements involved may testify to them and give his estimate of value."

In a much later decision, *Airight Sales, Inc. v. Graves Truck Lines, Inc.*, 207 Kan. 753, 756, 486 P.2d 835 (1971), our Supreme Court stated:

"We do not deem a treatise on the law of damages necessary to the disposition of this case. An extensive annotation on the measure of damages for conversion or loss of, or damage to, personal property having no market value appears at 12 A.L.R.2d 902. See also, 25 C.J.S., Damages, §§ 88-90; 22 Am. Jur. 2d, Damages, §§ 148-151. Factors considered as relevant

to damages where no 'market' obtains include cost of repair, original cost, 'intrinsic' value, loss of use, any special value to the owner, the loss of expected profits, and the cost of replacement."

While the Kansas decisions give the courts a great deal of latitude in arriving at the proper measure of damages depending on the facts present, it appears that all of the various approaches at computing damages have the same ultimate goal: to make the damaged party whole. In *N.J. Power & Light Co. v. Mabee*, 41 N.J. 439, 441, 197 A.2d 194 (1964), the court stated: "[T]he sundry rules for measuring damages are subordinate to the ultimate aim of making good the injury done or loss suffered and hence 'The answer rests in good sense rather than in a mechanical application of a single formula.' "

In the instant matter, neither party appears to argue seriously that the utility pole in question had a market value. It also appears that both parties agree that, to an extent, a proper measure of damages is the replacement cost of the pole and the cost of labor and overhead in installing the replacement pole as part of the distribution system. It is at this juncture that the arguments of both parties go opposite directions.

Thatcher argues that the pole in question was 35 years old, the average age of the plaintiff's wooden utility poles, and that plaintiff had depreciated the cost of the pole for accounting and tax purposes at the rate of 3.43 percent per year. Thus, Thatcher asserts that KP&L has already recovered the cost of the damaged pole through depreciation. She argues that KP&L will receive a windfall if it is allowed to recover the cost of a new pole with no offset for depreciation. Counsel for Thatcher asserts that since the pole in question was 100 percent depreciated, KP&L sustained no monetary loss when Thatcher's car struck it down. Thatcher approaches the problem as though the pole became worthless upon reaching the age of 35.

KP&L argues that the pole in question is but one small part of its distribution system and that if the pole is destroyed it must be replaced immediately to keep the system in operation. KP&L admits that it depreciated the pole at the rate of 3.43 percent per year for accounting and tax purposes and that the average life of such a pole is 35 years. However, KP&L points out that it does not automatically replace each pole after it attains the age

of 35 years, but only does so when the pole wears out and it becomes necessary to make a replacement. KP&L argues that the pole is analogous to a door handle on an automobile. If the handle is damaged, the proper measure of damages is the replacement of that door handle and depreciation is not a factor. Arguing by analogy, KP&L insists that the pole is no more significant in the overall makeup of its distribution system than a door handle is in the overall makeup of a car. Therefore, KP&L argues that it should be allowed to recover the entire cost of repair and replacement of the damaged pole unreduced by any artificial factors such as depreciation.

We must decide, then, whether KP&L's recovery for repairing or replacing one of its utility poles damaged by the negligence of a tortfeasor must be offset or reduced by depreciation.

In resolving this issue, we have attempted to apply the reasoning set forth in *N.J. Power & Light Co. v. Mabee* and to use "good sense" in selecting a measure of damages that will most effectively "make good the injury done."

In analyzing the problem, it should be clearly noted that it was the defendant who, without fault on the part of KP&L, negligently and without justification ran into and destroyed an intricate part of KP&L's electrical distribution system. As a result, KP&L was forced to immediately replace the damaged pole in order to put its system back in operation. We are unable to conclude that KP&L's system was any more valuable with the new pole than it was with the 35-year-old pole.

As we interpret the facts stipulated to the trial court, the pole replaced was not scheduled for immediate replacement and would not have been replaced unless and until necessity made replacement an immediate requirement. Under those facts, to what extent does the age of the pole figure into the question of damages? On its books, for accounting purposes, KP&L had recovered the cost of the pole through depreciation; what effect does that fact have on the damages suffered?

There are two distinct lines of authority in this country regarding the amount that may be recovered for an item that has been depreciated, totally at odds with one another. The majority view holds that plaintiff may recover the cost of the replacement pole without reduction by depreciation. The minority view holds

the opposite to the effect that, while plaintiff may recover the cost of repairing or replacing its pole, it must reduce that cost by depreciation.

The states represented by the following decisions have adopted the majority rule: (1) California—*Pacific Gas & Electric Co. v. Alexander*, 90 Cal. App. 3d 253, 153 Cal. Rptr. 319 (1979) (decision dictated by statutory construction); (2) Connecticut—*Hartford Electric Light Co. v. Beard*, 3 Conn. Cir. Ct. 323, 213 A.2d 536 (1965); (3) Georgia—*Horton v. Ga. Power Co.*, 149 Ga. App. 328, 254 S.E.2d 479 (1979); (4) Louisiana—*Louisiana Power & Light Co. v. Smith*, 343 So. 2d 367 (La. App. 1977); (5) Mississippi—*Mississippi Power & Light Company v. Tillman*, 291 So. 2d 736 (Miss. 1974); (6) Missouri—*Board of Public Utilities v. Fenton*, 669 S.W.2d 612 (Mo. App. 1984); (7) New Jersey—*N.J. Power & Light Co. v. Mabee*, 41 N.J. 439; (8) North Carolina—*Light Co. v. Paul*, 261 N.C. 710, 136 S.E.2d 103 (1964); (9) Oklahoma—*Polk v. Oklahoma Gas & Electric Company*, 410 P.2d 547 (Okla. 1966); (10) Tennessee—*Middle Tenn. Elect. Corp. v. Barrett*, 56 Tenn. App. 660, 410 S.W.2d 914 (1966); (11) Washington—*Water Power v. Miller*, 52 Wash. App. 565, 762 P.2d 16 (1988); and (12) West Virginia—*Appalachian Power Co. v. Morrison*, 152 W. Va. 638, 165 S.E.2d 809 (1969).

The minority view is represented by the following decisions from these states: (1) Illinois—*Central Illinois Light Co. v. Stenzel*, 44 Ill. App. 2d 388, 195 N.E.2d 207 (1963); (2) New Mexico—*Public Service Co. of New Mexico v. Jasso*, 96 N.M. 800, 635 P.2d 1003 (Ct. App. 1981); (3) New York—*New York State Electric & Gas Corp. v. Fischer*, 24 App. Div. 2d 683, 261 N.Y.S.2d 310 (1965); (4) Ohio—*Ohio Power Co. v. Zemelka*, 19 Ohio App. 2d 213, 251 N.E.2d 2 (1969); and (5) Virginia—*Younger v. Appalachian Power Co.*, 214 Va. 662, 202 S.E.2d 866 (1974).

After a careful review of the two viewpoints, we have concluded that the majority view is the least complicated in its application and is more likely to make the plaintiff whole, and as a result we adopt that view as the law in Kansas. This rule will assure that damaged or destroyed property of vital interest to the public, such as a utility company power pole, will be promptly repaired or replaced on a simple, practical, noncontroversial basis.

The minority view is somewhat restrictive in scope. Its view is confined to damage caused to one pole out of hundreds, and it fails to take into consideration that the damaged pole is only one small part of a larger distribution system. The repair of one pole out of hundreds in a system simply restores the system to operation and the system itself is worth no more nor no less than it was prior to the replacement of that one pole. Indeed, the minority view cases suffer somewhat from inaccuracies, as noted by an Ohio court in *Cincinnati Bell v. Cooper*, 23 Ohio Misc. 2d 9, 10, 491 N.E.2d 411 (Ohio Mun. Ct. 1985), wherein the court stated:

"Initially, it is inaccurate to view this matter as one involving damage to property solely. It is, in fact, most importantly, a case involving disruption and loss of service. Therefore, the correct measure of damages is the cost of reestablishing service, *i.e.*, the cost of making plaintiff whole."

In *Hartford Electric Light Co. v. Beard*, 3 Conn. Cir. Ct. at 325, in setting forth the majority view, the Connecticut court stated:

"As to the allowance of depreciation, it seems to us that the true issue is whether the replacement of the pole did more than make the plaintiff whole or whether, if it did, it would be just to make the victim of the wrong contribute so much of the cost as would reflect that further benefit. In short, at least upon the record before us, we cannot say with reasonable assurance that the installation of a new pole did more than remedy the wrong done. An injured party should not be required to lay out money, as the defendant's approach would require, upon a questionable assumption that one day its worth will be recaptured. [Citations omitted.]"

We agree with the Connecticut court and hold, in this case, that the replacement of the pole did nothing more than make KP&L whole. We further are of the opinion that if there are any equities in a matter such as this, they lie with KP&L and that any small gain which can be measured through our approach to this question must be borne by the tortfeasor.

In short, although there is a life assigned to the poles as a group for tax and accounting purposes, there is no evidence that there was a discernable life expectancy for any particular pole in the system or that there was a program to replace a pole as it reached a certain age. In adopting the majority view, we adopt

the language of *N.J. Power & Light Co. v. Mabee*, 41 N.J. at 442, as follows:

"It seems to us that the true issue is whether the replacement of the pole did more than make plaintiff whole and whether, if it did, it would be just to make the victim of the wrong contribute so much of the cost as would reflect that further benefit.

"If the life of every pole were 36 years and if it were clear that each pole would be replaced at the end of that period, defendants could well urge that a new pole clearly conferred a benefit beyond the amount of the damage done. The difficulty is that there is no discernible life expectancy of an individual pole and that although the period of 36 years is used for accounting purposes, the pole that was destroyed might well have served for a much longer period and the new pole may last for but a few years. Moreover, because of changes in circumstances or in technology, it cannot be known whether the pole would ever have been replaced. In short, at least upon the record before us, we cannot say with reasonable assurance that the installation of a new pole did more than remedy the wrong done. An injured party should not be required to lay out money, as defendants' approach would require, upon a questionable assumption that one day its worth will be recaptured."

A case similar to the instant matter is *Water Power v. Miller*, 52 Wash. App. 565. In that case, the Washington Court of Appeals stated:

"Here, the Millers argue WWP had recovered fifteen thirty-fifths of the cost of the pole through depreciation by the time of the accident. However, the trial court found the damaged pole had no set life expectancy. This finding is supported by the testimony that WWP replaces its poles only when necessary and that its poles last from 6 hours to 80 years. The court's finding in turn supports a conclusion that WWP received no measurable benefit from replacing the pole beyond the immediate benefit of restoring its distribution system.

"Testimony relied upon by the Millers that utility poles have an 'average' life expectancy of 35 years does not prove this pole would have been in service only 20 additional years. The length of time this pole might have remained in the ground is pure speculation and speculation does not provide a sufficient basis for damages. [Citation omitted.] Consequently, we hold the court correctly denied the Millers a credit for depreciation. The facts here are distinguishable from those cases where the utility has a systematic program for replacing poles after a given number of years." 52 Wash. App. at 571-72.

The evidence in this case is similar to the evidence in the Washington case cited above. We believe the reasoning set forth

by the Washington court is relevant to the issue at hand and adopt that reasoning.

We hold, therefore, that KP&L is entitled to recover the cost of replacing or repairing the pole, without deduction for depreciation, that was damaged by the defendant's negligence.

Affirmed.